# United States Court of Appeals
## For the First Circuit

Nos. 13-2224
    13-2276
    13-2284

UNITED STATES OF AMERICA,

Appellee,

v.

JUAN M. LAUREANO-PÉREZ,
JEFFREY JOHN CUMMINGS-ÁVILA, and
CHRISTOPHER L. LAUREANO-PÉREZ,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. José Antonio Fusté, U.S. District Judge]

Before
Torruella, Lynch, and Barron,
Circuit Judges.

Lydia Lizarríbar-Masini, for appellant Juan M. Laureano-Pérez.
Karen A. Pickett, with whom Pickett Law Offices, P.C. was on brief, for appellant Jeffrey John Cummings-Ávila.
Jeremy Gutman, with whom Todd M. Merer, were on brief, for appellant Christopher L. Laureano-Pérez.
Sonja M. Ralston, Attorney, Appellate Section, Criminal Division, U.S. Department of Justice, with whom Leslie R. Caldwell, Assistant Attorney General, Sung-Hee Suh, Deputy Assistant Attorney General, Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, Appellate Chief, were on brief, for appellee.

July 30, 2015

**TORRUELLA, Circuit Judge**. Defendants Juan Laureano-Pérez ("Juan"), Jeffrey Cummings-Ávila ("Cummings"), and Christopher Laureano-Pérez ("Christopher")[1] (collectively, "Defendants") were convicted of various narcotics possession, firearm, and conspiracy charges arising out of their participation in an illicit drug organization. All three appeal their convictions, alleging a host of errors during the pretrial and trial phases of the proceedings; Cummings and Christopher also challenge their sentences. For the reasons explained below, we affirm all of the convictions, as well as Cummings's sentence. However, we vacate Christopher's sentence and remand for re-sentencing.

## I. Background

We begin with a general overview of the facts and prior proceedings, reserving additional factual and procedural details for the relevant discussions below. For present purposes, it is enough to know that Defendants were members of a large drug organization operating in the Residencial Villas de Monterrey public housing project in Bayamón, Puerto Rico (the "Housing Project") which sold a wide array of narcotics, including heroin, cocaine base ("crack" cocaine), powder cocaine, and marijuana. Additionally, Defendants had different roles in the conspiracy.

---

[1]  Because Juan Laureano-Pérez and Christopher Laureano-Pérez are brothers with the same last name, we refer to them by their first names in order to distinguish them. We mean no disrespect in doing so.

Christopher was the leader of the organization. Known as both "Negro" and "the boss," he owned the majority of the drugs sold in the Housing Project, and, wanting the organization's pushers and runners to be armed, he also supplied the organization with weapons. Juan, meanwhile, was Christopher's brother and known as "McGyver." Juan's role was an enforcer. Finally, Cummings, or "Pitillo," was an enforcer as well, though he would also deliver drugs on occasion. Both Juan and Cummings were known to carry .40 caliber pistols.

Cummings was initially indicted on May 30, 2012, and was charged with: possession with intent to distribute heroin, cocaine base ("crack" cocaine), and cocaine, each in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(c), 860 (Counts One through Three, respectively); possession with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(D), 860 (Count Four); illegal possession of a machinegun, in violation of 18 U.S.C. §§ 922(o), 924(a)(2) (Count Five); and possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i), (B)(ii) (Count Six). Six months later, on November 28, 2012, a superseding indictment was returned. This superseding indictment retained the initial six charges from the May indictment but also added two more: conspiracy to possess with intent to distribute controlled substances in a protected location, in violation of 21 U.S.C. §§ 841(a)(1), 846, 860 (Count Seven), and

conspiracy to possess firearms in furtherance of a drug trafficking conspiracy, in violation of 18 U.S.C. § 924(c)(1), (o) (Count Nine). It also brought charges against Christopher, Juan, and forty-one other co-conspirators.[2] Christopher and Juan were both charged with the two conspiracy counts (Counts Seven and Nine), while Juan was also charged with possession of a firearm in furtherance of a drug conspiracy, in violation of 18 U.S.C. § 924(c)(1)(A)(i), (B)(ii) (Count Eight).

Trial began on June 5, 2013, and after eight days of trial, Defendants were convicted on all counts. Juan and Christopher were subsequently sentenced to life imprisonment, while Cummings was sentenced to 480 months. These timely appeals followed.

## II. Pre-Trial Issues

Only Cummings raises pre-trial issues, and he does so both through his attorney and through a supplemental pro se filing. We address each in turn.

## A. The Disqualification of Cummings's Counsel

Cummings first argues that the district court violated his constitutional right to counsel both when it ordered the disqualification of his attorney, Jorge Armenteros-Chervoni ("Armenteros"), due to a conflict of interest and when it later

---

[2] None of these other co-conspirators went to trial with Defendants.

-4-

refused to re-appoint Armenteros despite Cummings's attempt to waive the conflict. "We review decisions to disqualify an attorney for conflict of interest for abuse of discretion." United States v. Lanoue, 137 F.3d 656, 663 (1st Cir. 1998). Here, we find no such abuse.

### 1. **Relevant Facts**

On June 5, 2012, the district court granted Cummings's motion to be represented by Armenteros instead of a court-appointed attorney from the Office of the Federal Defender. A month later, the government became concerned over the source of Armenteros's attorney fees, so it filed a motion asking the court to determine: (1) the source of Armenteros's attorney fees; (2) whether Armenteros was retained or paid by an individual other than Cummings; (3) whether there was a conflict of interest; and (4) if there was a conflict, whether Cummings was waiving the conflict and whether the district court would accept the waiver. At a status conference on July 26, 2012, the district court set a briefing schedule and hearing date for the issue.

Though the government never filed its formal motion, the district court held the hearing on August 14. At the hearing, Armenteros objected, arguing that the hearing was "premature . . . because I don't know what is the issue or what is the intent." The district court disagreed, stating that the parties were there "to figure out the issue." The government then informed the court that

-5-

it had met with Armenteros and that the government had "showed him recordings of his defendant, which proved that . . . Attorney Armenteros [] was retained by another person who is not the defendant in this case."  The government added that Armenteros "did not deny" that he was being paid by another person.  In response to this proffer, the district court asked Armenteros about the source of his fees, but Armenteros refused to answer.  Instead, Armenteros responded:

> [W]ith all due respect we're going to claim a due process right now, Your Honor, because I don't think that the hearing can come to find out what was going on.  I think the prosecutor must make a claim, and we must respond to it. . . .  I'm telling you that I am not clear what is the claim to which I have to respond . . . .

The district court once again explained that the claim was that Cummings was not paying his own attorney fees but rather that they were coming from a third party.  To this, Armenteros replied that "that's not the information that I have been given."  He went on to explain that he had received a $5,000 initial payment and that his relationship with Cummings "date[d] back to another case" in which he defended Cummings and was successful in having the case dismissed.  Armenteros conceded that he had heard one of the recordings involving Cummings but nevertheless maintained that "the only person that I talked to is [Cummings] who told me, go and look for some money, okay, in order to get my fees."

At this point, the government interjected, explaining that it was "trying to protect . . . the right of the defendant" because it would create a "clear conflict of interest" if the person paying Armenteros's fees were someone who the government might require Cummings to testify against should he enter a plea. The district court agreed, noting to Armenteros that

> [i]f it's true that there is a possibility that a third party is paying for your client's defense, and your client is in a situation whereby he's facing a 30-year minimum, the Government is not going to offer any plea bargaining to him, it is entirely possible that the purpose, that the purpose of somebody else paying for the defense is to keep him shut.

Armenteros once again objected, arguing that he "underst[oo]d that those funds came from the defendant" and that the government's position "presupposes . . . that that [third] person told me to go defend this person." Armenteros argued that "that has never been the case" and "[i]n fact, there are a million phone calls of Mr. Cummings'[s] wife asking me to go and visit him once after he's arrested." Armenteros emphasized that he could recognize a conflict of interest and was positive that no conflict existed.

The court then proceeded to hear the two telephone recordings of Cummings with counsel for both the government and Cummings present. In the first, Cummings spoke to Ana Saurí, Cummings's girlfriend's mother, and told her that his lawyer had come to visit him and that "they paid him the money." Saurí added

that she spoke with Armenteros and asked him to get someone she called "Negrito" out of jail, to which Armenteros responded, "Don't mention that name." Cummings also informed Saurí that Armenteros had told him that if "they work with me on the money and stuff . . . what I ask them in order to help you, then I will come on Monday." Later on in the call, Christopher, who had not yet been indicted, took the phone from Saurí and spoke with Cummings. Cummings thanked Christopher "a million for the attorney thing" and added that Armenteros had told him that "[t]hey gave [Armenteros] 10" and that Cummings could give Armenteros "the other 10 . . . when you get out." Christopher also stated that he "was going to see if . . . [he] could send something with the attorney, but it wasn't possible."

The second recording involved Cummings, Saurí, her daughter Ashley, and Christopher. In this call, Cummings asked Christopher, "what did the lawyerinski say to you?" and Christopher responded that "[h]e hasn't showed up. I have been calling him and he hasn't showed up . . . . [H]e came to talk about money, but he hasn't returned." Cummings once again thanked Christopher for the money, to which Christopher responded that "[t]his is not about the money, this is about being united." At the end of the call, Cummings asked Christopher to put pressure on Armenteros because he "does not come here to visit me," and Christopher responded that he

will "try[] to call and contact him, but he doesn't want to talk to me . . . . But, everything that he tells me I will tell you."

Once the recordings were finished, the district court asked Armenteros if Cummings was "willing to answer some questions from" the court, but Armenteros declined the invitation because it was a "very dubious situation." The court emphasized that

> in order for me to make a decision, a balanced
> decision, I have to ask him some questions to
> figure out, you know, first of all, who is the
> person that is paying the fees, what is the
> relationship with him, and advise him of the
> potential conflicts, et cetera. And he has to
> make a decision, and then I have to make my
> own decision. But we have to have an exchange
> obviously.

Still, Armenteros declined. He informed the court that Cummings was "more than willing to listen to whatever the Court has to say. However, he's not in a position at this point to give any statement to the Court . . . ." The government objected to this refusal, arguing "[t]hat's exactly the conflict of interest. The attorney is there, and I don't know if the client wants to talk to the Court or if the attorney is not letting the client."

The district court agreed:

> If it's clear to me that a third party is
> paying for the fees, then I have an obligation
> to have some sort of dialogue, if you will,
> that has to be through questions and answers
> with the defendant, and advise him, get
> information from him about this situation, and
> advise him of the potential risks and
> conflicts. But I am in a situation whereby
> the defendant doesn't want to deal with that
> issue with me. So I'm getting no information

-9-

from him . . . . [It] is quite clear, that [Christopher][3] is paying for the fees, and that [Christopher] has control over a bunch of things that pertain to the defense obviously.

. . . .

. . . All I'm saying is that it's quite clear, quite clear from those tapes that [Christopher], who is the purported leader, has advanced the funds, retained you to deal with Cummings, to represent Cummings, and that Cummings is eternally grateful to [Christopher] for having done that. Not only that, [Christopher] and Cummings are going to decide basically what the strategy's going to be together, and the strategy is going to be such that [Christopher] will not be prejudiced. . . .

. . . .

. . . You have been retained and paid by a third party. . . . [I]t goes beyond that, because one thing is the act of a charity of a third party to pay a defense of somebody dear to him. Another thing is a situation whereby the defense is being paid by a third party but at the same time there is intervention of that third party and the defendant as to how they're going to deal with the issue. Basically, not only to defend Cummings, but also to make certain that [Christopher] doesn't get involved.

Seeing how the court was leaning, Armenteros asked the district court to delay making a ruling, but the court refused, stating that "[i]t's made." The district court proceeded to explain its ruling as follows:

---

[3]  Throughout the hearing, the district court mistakenly referred to Christopher as Christian.

[T]he reasons are the ones that I've stated: No cooperation on defendant's side; obvious conflict of interest; failure on the defendant's side, who has a burden, too, to put me in a position to make a balancing, a balancing that is going to be very difficult to make even if he tells me something, because of the content of the tapes.

Therefore, I am once again stating that there is a potential material, huge conflict of interest here that will not allow you to be his attorney in this case.

Three months later, on November 28, 2012, Cummings filed a motion requesting that Armenteros be re-appointed as his attorney. In the motion, Cummings stated that

Mr. Armenteros has been my attorney since February 18, 2010 . . . . I feel that he has allways [sic] and will continue to have my complete confidence as my attorney.

. . . .

I do not believe that Mr. Armenteros has a conflict of interest. But in any case if it were true, I am willing to waive said conflict.

The motion was denied on January 28, 2013.

### 2. **The District Court Did Not Abuse Its Discretion**

The Sixth Amendment guarantees the right of an individual accused in a criminal prosecution to "have the Assistance of Counsel for his defence," U.S. Const. amend. VI, which necessarily includes "the right to have an attorney of one's own choosing." Lanoue, 137 F.3d at 663. This right, however, is not absolute. Id. To the contrary, because the "essential aim" of the Sixth

-11-

Amendment "is to guarantee an effective advocate for each criminal defendant," Wheat v. United States, 486 U.S. 153, 159 (1988), "[o]ne important limitation on th[is] right is the trial court's interest in ensuring that criminal trials are conducted within ethical and professional standards." In re Grand Jury Proceedings, 859 F.2d 1021, 1023 (1st Cir. 1998).

To that end, "[i]f there is a realistic potential for conflict of interest," a district court's "concern may override a defendant's Sixth Amendment right freely to choose his lawyer." Id. And while a defendant can often waive the conflict, this, too, is not absolute. See, e.g., Wheat, 486 U.S. at 158-59; Lanoue, 137 F.3d at 663. A district court may decline to accept a defendant's waiver "not only in those rare cases where an actual conflict may be demonstrated before trial, but [also] in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." In re Grand Jury Proceedings, 859 F.2d at 1023-24 (alteration in original) (emphasis omitted) (quoting Wheat, 486 U.S. at 163) (internal quotation marks omitted). Still, there must be a "showing of a serious potential for conflict" to overcome the presumption in favor of a defendant's selection of counsel. Id. at 1024.

One such serious potential for conflict occurs when "a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the operator of

the alleged criminal enterprise." Wood v. Georgia, 450 U.S. 261, 268-69 (1981); see also United States v. Urutyan, 564 F.3d 679 (4th Cir. 2009). The conflict arises because a lawyer could be inclined to "prevent his client from obtaining leniency by preventing the client from offering testimony against his former employer or from taking other actions contrary to the employer's interest." Wood, 450 U.S. at 269.

That was the precise situation facing the district court. The government alerted the district court that it was concerned Armenteros was being paid by Christopher -- the leader of the drug organization connected to Cummings's arrest -- and wanted the court to inquire further. In response, the district court held a hearing in which it heard two recordings unequivocally showing that Armenteros was being paid by somebody other than Cummings, most likely Christopher, and in which it learned that any plea agreement offered by the government would necessarily entail cooperation against others, including Christopher.[4] Given this evidence, the potential for a conflict of interest was obvious. See Lanoue, 137

---

[4] We reject Cummings's argument that his due process rights were violated when the district court held the hearing despite the government's failure to file a formal motion as ordered by the district court. The government made its concerns clear both through its initial informative motion to the court and through its arguments at the status conference. Moreover, the government met with Armenteros and "previewed" one of the recorded phone conversations. Any allegation that Armenteros was faced with an unfair surprise and was unable to prepare for the hearing, therefore, is disingenuous at best.

F.3d at 664 ("The district court in this case did not make the decision to disqualify summarily. It held a hearing and allowed each side to present its arguments for and against disqualification."); see also Urutyan, 564 F.3d at 687 (finding no abuse of discretion in district court's disqualification of attorney due to a conflict of interest where district court heard a telephone recording between defendant and co-defendant discussing how a member of the alleged conspiracy could provide defendant with an attorney). Add to this the fact that Armenteros was uncooperative throughout the hearing and prohibited Cummings from partaking in a colloquy with the court, and the district court's conclusion that there was a likelihood of a conflict of interest was only further supported.[5] Cf. United States v. Diozzi, 807 F.2d 10, 13 (1st Cir. 1986) (finding no conflict of interest where the attorneys were cooperative). Accordingly, we find no abuse of discretion in the district court's decision to disqualify Armenteros.

---

[5] That Cummings later seemed willing to engage in a discussion with the district court through the filing of a motion to waive any conflict does not alter our analysis. This waiver occurred months after the initial hearing, and after Christopher had been indicted as a co-defendant. Christopher's indictment only increased the chances of a conflict since Armenteros would be representing Cummings while being paid not by some third party but by a co-defendant with different interests. As such, the district court's decision to reject Cummings's waiver motion was also not an abuse of discretion. See Wheat, 486 U.S. at 163; In re Grand Jury Proceedings, 859 F.2d at 1023.

**B.  The Speedy Trial Act**

Cummings next argues that due to a violation of the Speedy Trial Act, 18 U.S.C. § 3161, the district court should have dismissed Cummings's initial indictment with prejudice, thus barring the inclusion of those charges in the superseding indictment.  We disagree with Cummings that the Speedy Trial Act was violated.

**1.  Standard of Review**

We review the district court's Speedy Trial Act determination de novo.  United States v. Barnes, 159 F.3d 4, 9-10 (1st Cir. 1998) ("Barnes I").  In doing so, we "start from scratch in the computation of excludable and nonexcludable time under the Act" by first "do[ing] the basic mathematics and determin[ing] the aggregate time elapsed awaiting trial," and then "ascertain[ing] how many days should be excluded from the total time."  Id. at 10 (internal quotation marks omitted).  However, we do not go hunting for nonexcludable time; exclusions of time not specifically challenged in the district court are waived on appeal.  United States v. Gates, 709 F.3d 58, 67-68 (1st Cir. 2013).

**2.  The Speedy Trial Act Was Not Violated**

The Speedy Trial Act "commands that a defendant be tried within 70 days of the latest of either the filing of an indictment or information, or the first appearance before a judge or magistrate."  Barnes I, 159 F.3d at 9 (internal quotation marks and

citations omitted).  Certain periods of time, however, are excluded

from this seventy-day calculation.  These include:

> [a]ny period of delay resulting from other
> proceedings concerning the defendant,
> including but not limited to --
>
> . . . .
>
> (F) delay resulting from any pretrial motion,
> from the filing of the motion through the
> conclusion of the hearing on, or other prompt
> disposition of, such motion;
>
> . . . .
>
> (J) delay reasonably attributable to any
> period, not to exceed thirty days, during
> which any proceeding concerning the defendant
> is actually under advisement by the court.
>
> . . . .
>
> (8)(A) Any period of delay resulting from a
> continuance granted by any judge on his own
> motion or at the request of the defendant or
> his counsel or at the request of the attorney
> for the Government, if the judge granted such
> continuance on the basis of his findings that
> the ends of justice served by taking such
> action outweigh the best interest of the
> public and the defendant in a speedy trial.

Id. (alterations in original) (quoting 18 U.S.C. § 3161(h)).

Here, the parties agree that we begin counting on

June 15, 2012 -- the date of Cummings's arraignment[6] -- and that we

_____

[6]  It is unclear to us why the parties begin counting on June 15,
2012, the date of Cummings's arraignment.  The Speedy Trial Act
instructs that we begin counting on the later of a defendant's
first appearance or indictment; it says nothing about a defendant's
arraignment.  See 18 U.S.C. § 3161(c)(1); Barnes I, 159 F.3d at 9.
Cummings was indicted on May 30, 2012, and his first appearance
occurred on May 2, 2012.  Thus, the proper starting date should

-16-

stop the clock on November 28, 2012 -- the date the superseding indictment adding Cummings's co-defendants was filed. See United States v. Barnes, 251 F.3d 251, 258 (1st Cir. 2001) ("Barnes II") (holding that the Speedy Trial Act clock resets upon the return of a superseding indictment adding new defendants in order to "synchronize[]" the cases and avoid piecemeal prosecutions and duplicative proceedings). This is a total of 167 days. We find the following days to be excludable under the Act:

| Date(s) | Number of Days | Reason |
|---|---|---|
| June 15, 2012 | 1 | Arraignment -- a "proceeding[] concerning the defendant." Id. § 3161(h)(1). |
| June 20, 2012 - June 25, 2012 | 6 | Motion for Rule 404(b) disclosures -- a "pretrial motion, from the filing of the motion through . . . disposition." Id. § 3161(h)(1)(D). |
| June 25, 2012 - June 27, 2012 | 2[7] | Motion for continuance. Id. § 3161(h)(7). |
| July 3, 2012 - July 9, 2012 | 7 | Continuance.[8] Id. |

have been May 30. However, because Cummings never argued for this starting point, any nonexcludable time between May 30, 2012, and June 15, 2012, is waived. See Gates, 709 F.3d at 67-68.

[7]   Three days elapsed from the filing of the motion on June 25 until its resolution on June 27. However, we only include two excludable days because June 25 was already excluded as part of the 404(b) motion.

[8]   Cummings argues that these seven days should not be excluded because the district court never explicitly found that "the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial" as required by the

| | | |
|---|---|---|
| July 9, 2012 - July 26, 2012 | 17[9] | Motion for discovery -- a "pretrial motion, from the filing of the motion through . . . disposition." Id. § 3161(h)(1)(D). |
| July 23, 2012 - August 14, 2012 | 19[10] | Motion to disqualify counsel -- a "pretrial motion, from the filing of the motion through . . . disposition." Id. |
| August 21, 2012 | 1 | Status conference -- a "proceeding[] concerning the defendant." Id. § 3161(h)(1). |
| September 7, 2012 | 1 | Status conference -- a "proceeding[] concerning the defendant." Id. |
| September 8, 2012 - September 20, 2012 | 13 | Time between request for status conference and holding of status conference.[11] |

Speedy Trial Act. See 18 U.S.C. § 3161(h)(7)(A). However, we have held that a district court need not explicitly state its reasons for granting a continuance nor make a "best interest" finding if it is "'obvious and set forth in [the] motion for a continuance.'" See United States v. Pringle, 751 F.2d 419, 432 (1st Cir. 1984) (quoting United States v. Rush, 738 F.2d 497, 507 (1st Cir. 1984)). Cummings's motion for a continuance was premised on Cummings's counsel being out of the jurisdiction during the continued period. This is considered a sufficient reason to exclude the time. See id. at 432-33 (finding that delays resulting from defense counsel's scheduling conflicts and defendant's travel outside the jurisdiction were excludable).

[9] This seventeen-day period excludes the July 9 overlap with the continuance.

[10] This nineteen-day period excludes the four-day overlap with Cummings's discovery motion.

[11] It is unclear to us why the parties exclude this time. Cummings's request for an additional status conference does not appear to fit under § 3161(h)(1)(D) as a "pretrial" motion, and even if it did, the motion would have been disposed of as soon as the court agreed to hold another conference, since the requested conference itself cannot be fairly categorized as a hearing on the

| September 21, 2012 | 1 | Status conference -- a "proceeding[] concerning the defendant." Id. |
|---|---|---|
| October 18, 2012 | 1 | Status conference -- a "proceeding[] concerning the defendant." Id. |
| October 24, 2012 – October 26, 2012 | 3 | Motion by Cummings -- a "pretrial motion, from the filing of the motion through . . . disposition." Id. § 3161(h)(1)(D). |
| October 30, 2012 – November 15, 2012 | 17 | Cummings pro se motion asserting his right to a speedy trial -- a "pretrial motion, from the filing of the motion through . . . disposition."[12] Id. |

motion. Similarly, we do not believe the time can be categorized as an excludable continuance under § 3161(h)(7), since even if it were considered a continuance, there are no findings -- either explicit or obvious from the record -- that would qualify it as excludable. Nevertheless, because Cummings never argues for its nonexclusion, we exclude it. See Gates, 709 F.3d at 67-68.

[12] This court has never formally ruled on whether pro se motions are excludable under the Speedy Trial Act. Given that both parties excluded the days in their respective calculations and the exclusion of these days does not affect our calculation, we assume, without deciding, that the days are excludable.

| | | |
|---|---|---|
| November 8, 2012 – November 28, 2012 | 13[13] | Government continuance.[14] Id. § 3161(h)(7). |

Adding all of these days together, 102 days were excludable.  This leaves sixty-five nonexcludable days, five less than the permitted seventy.  Accordingly, the Act was not violated.

**C.  The Sufficiency of the Superseding Indictment**

In his pro se brief, Cummings argues that the superseding indictment was flawed in two key respects.  First, he alleges that because the § 922(o) charge (Count Five) failed to provide proper notice of what the government considered a machinegun and what statute made it illegal, his Fifth Amendment right to due process was violated.  Second, he claims that the superseding indictment's reference to "crack" cocaine in Counts Two and Seven was insufficient following the Supreme Court's 2011 decision in DePierre v. United States, 131 S. Ct. 2225 (2011), which clarified the meaning of "cocaine base."  Cummings never raised these

---

[13]  This thirteen-day period excludes the eight-day overlap with Cummings's pro se motion.

[14]  Cummings objects to the exclusion of these days because the court never made explicit its findings and rationale for granting the continuance.  As we stated above, this is not necessary if the reasons are obvious.  Pringle, 751 F.2d at 432.  The government explains that the continuance was requested due to the impending filing of the superseding indictment.  Because a continuance in this situation would allow all Defendants to be tried together and to avoid piecemeal and repetitive proceedings, "the ends of justice served by taking such action outweigh the best interests of the defendant in a speedy trial," 18 U.S.C. § 3161(h)(7)(A), and thus the days are properly excluded.  See Barnes II, 251 F.3d at 256.

challenges in the district court, and his failure to do so "constitutes a forfeiture, which confines appellate review to plain error."  United States v. Troy, 618 F.3d 27, 34 (1st Cir. 2010); see also Fed. R. Crim. P. 12(b)(3)(B) (stating that challenges to the sufficiency of an indictment must be raised prior to trial). Plain error exists when: (1) an error occurred; (2) which was clear or obvious; and both (3) affected the defendant's substantial rights; and (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings.  Troy, 618 F.3d at 33. We need not go past the first step, however, because neither alleged error has any merit.

### 1. **Count Five of the Superseding Indictment Is Not Defective**

"An indictment is legally sufficient if it 'first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'"  United States v. Berk, 652 F.3d 132, 137 (1st Cir. 2011) (quoting United States v. Cianci, 378 F.3d 71, 81 (1st Cir. 2004)).

Here, Count Five of the superseding indictment alleges that

> [o]n or about May 2nd, 2012, in the District of Puerto Rico and within the jurisdiction of this Court, Jeffrey Cummings-Ávila, the defendant herein, did knowingly and unlawfully possess, machineguns, to wit: (1) a Glock

-21-

> pistol, Model 23, .40 caliber, serial number on the body PDW-403 and another different serial number ETE-057 on the side; (2) a Glock pistol, model 23, .40 caliber, serial number RYM722, both firearms modified to shoot automatically more than one shot, without manual reloading, by a single function of the trigger. All in violation of Title 18, U.S.C. Section 922(o) and 924(a)(2).

This description contains all of the elements of Section 922(o)(1),[15] which provides that "it shall be unlawful for any person to transfer or possess a machinegun," and it quotes verbatim from 26 U.S.C. § 5845(b), which defines a machinegun as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." It also describes the specific machineguns at issue. As such, Cummings was fairly informed of what he had to defend against, and the indictment was therefore sufficient. See Berk, 652 F.3d at 137; United States v. Just, 74 F.3d 902, 904 (8th Cir. 1996) (finding indictment for possession of a machinegun sufficient where it only cited to § 922(o) and did not include language defining a machinegun).

That the superseding indictment only quotes the language of § 5845(b) without citing to the statute directly does not alter this conclusion.[16] It is the language describing the elements that

_____

[15] Cummings makes no argument regarding § 924(a)(2).

[16] We do note, however, that in an abundance of caution it would be in the government's best interest to cite to all relevant provisions, especially when directly quoting from those provisions.

-22-

puts a defendant on notice, not a simple citation to a statute. Cf. United States v. Daniels, 973 F.2d 272, 275 (4th Cir. 1992) ("[T]he mere citation to the statute of which the defendant is charged with violating is insufficient to cure the failure of the indictment to charge each essential element of the offense because the citation alone does not insure that the grand jury considered and found each of these elements."). Moreover, while Cummings was charged with violating § 922(o), this is merely a subsection of § 922. A full reading of § 922 directs the reader to § 5845 for the meaning of a machinegun, see § 922(a)(4), (b)(4), and it is hornbook statutory construction that "identical words used in different parts of the same act are intended to have the same meaning." Sorenson v. Sec'y of Treasury, 475 U.S. 851, 860 (1986)(internal quotation marks omitted); see also, e.g., United States v. Ozuna-Cabrera, 663 F.3d 496, 499 (1st Cir. 2011).

Accordingly, we find no error with Count Five of the superseding indictment.

### 2. Counts Two and Seven of the Superseding Indictment Are Not Defective

In Counts Two and Seven of the superseding indictment, the government charged Cummings with possession with intent to distribute cocaine base and conspiracy to possess with intent to distribute cocaine base (and other narcotics), respectively. In Count Two, the superseding indictment states that Cummings "did knowingly and intentionally possess with intent to distribute a

-23-

measurable amount of a mixture or substance containing a detectable amount of cocaine base ('crack') . . . ." Count Seven, meanwhile, states that forty-four conspirators, including Cummings, "did knowingly and intentionally combine, conspire and agree with each other . . . to possess with the intent to distribute . . . two-hundred and eighty (280) grams or more of a mixture or substance containing a detectable amount of cocaine base ('crack') . . . ." According to Cummings, the inclusion of "crack" renders the superseding indictment insufficient because DePierre "decriminalize[d] certain individual's conduct . . . [which] would have otherwise been aggravated violators."

Cummings, however, badly misreads DePierre. In DePierre, the Supreme Court "h[e]ld that the term 'cocaine base' as used in § 841(b)(1) means not just 'crack cocaine,' but cocaine in its chemically basic form." 131 S. Ct. at 2237. In other words, the Supreme Court expanded the meaning of cocaine base to include other forms of cocaine in addition to crack cocaine.[17] Id. at 2231. It in no way "decriminalized" crack cocaine as Cummings seems to allege.

Counts Two and Seven of the superseding indictment charge possession with the intent to distribute and conspiracy to possess with the intent to distribute cocaine base. The parenthetical

---

[17] These include freebase and coca paste. DePierre, 131 S. Ct. at 2231.

inclusion of "crack" simply specified which form of cocaine base was at issue. There is nothing improper about this practice.[18]

### III. **Trial Issues**

Defendants also present a number of alleged errors they claim occurred during the trial itself. We address each in turn, noting that unless otherwise stated, the issue was raised in some form by all three Defendants.

### A. **The Admission of Certain Pieces of Evidence**

Defendants claim that various pieces of evidence -- the testimonies of Marco A. Díaz Narváez ("Díaz"), Carlos Rivas Serrano ("Rivas" or "Gordo"), and Officer Luis Vázquez Torres ("Officer Vázquez"), and the two phone calls between Cummings and Christopher -- were improperly admitted. As explained in more detail below, all of the evidence was admissible.

#### 1. **Díaz**

##### a. **The Contested Testimony**

Díaz was a member of the conspiracy who agreed to cooperate with the government. According to Díaz, he was a seller in the organization and would also store guns for Christopher. After discussing his involvement, Díaz testified about three

---

[18] Cummings makes a similar unpreserved argument regarding the jury instructions for these counts, alleging that it was error to instruct the jury on crack cocaine as opposed to cocaine base because crack and cocaine base were no longer synonymous under DePierre. For the same reasons discussed above, we reject this argument.

specific instances. The first two involved "rounds" with Juan. During these "rounds," Díaz -- driving Cummings's car -- would take Juan to a specified location, find the person they were looking for, beat the person up, put the person in the trunk of Cummings's car, and then drive for a while before letting Díaz out and continuing to drive onward with the victim in the trunk. Díaz testified that he never knew in advance where they were going, who they were looking for, or why they were looking for that person. Rather, he just followed Juan's instructions, which were being carried out on Christopher's behalf. Díaz added that Juan was armed both times and that Christopher was the leader of the conspiracy.

The third incident occurred one night in the Housing Project. According to Díaz, he had been on duty selling drugs late one night when he heard two shots. Shortly thereafter, Juan and Christopher appeared and enlisted Díaz's help putting a young man with a gunshot wound in his leg into a car. Díaz testified that he was later told that Juan had shot the young man -- who was not from the Housing Project -- twice at Christopher's behest.

### b. **This Testimony Was Properly Admitted**

Defendants contend that this testimony was irrelevant and thus should have been excluded. Because they made this objection at trial, we review for abuse of discretion. United States v.

Richardson, 421 F.3d 17, 37 (1st Cir. 2005). Contrary to Defendants' assertion, however, the testimony was relevant.

We reject Defendants' suggestion that Díaz's testimony shows that the "rounds" were not part of the drug conspiracy. Though Díaz did testify about the "rounds" in response to questions from the prosecutor about actions "aside from the drugs," a review of the transcript as a whole makes clear that the "rounds" were related to the drug organization. Given this relationship, there is little question that the testimony was relevant. See Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."). The testimony helped establish a connection between Defendants -- Juan, acting on Christopher's orders, used Cummings's car -- and between Defendants and the drug conspiracy -- the rounds, being conducted by Juan on Christopher's behalf, were in connection to the drug organization. It also helped to prove at least two allegations in the indictment -- that the roles of Christopher and Juan were leader and enforcer, respectively, and that the leaders of the organization would use force, violence, and intimidation in order to protect the conspiracy and maintain control. See United States v. Rivera Calderón, 578 F.3d 78, 95-96 (1st Cir. 2009) (holding that evidence of murders was relevant to

show the existence of a single, overarching drug conspiracy and to prove the defendant's involvement in the conspiracy).

As a fallback position, Defendants contend that even if the evidence was relevant, it should still have been excluded as unfairly prejudicial under Rule 403 of the Federal Rules of Evidence. Defendants never raised this objection below, and thus we review for plain error. Id. at 95; see also United States v. Ciresi, 697 F.3d 19, 26 (1st Cir. 2012). Under any standard, however, this argument fails. Evidence is only excluded under Rule 403 "if its probative value is substantially outweighed by 'the danger of unfair prejudice.'" United States v. Varoudakis, 233 F.3d 113, 121 (1st Cir. 2000) (quoting Fed. R. Evid. 403). And "unfair prejudice" is often reserved for "evidence that invites the jury to render a verdict on an improper emotional basis" or for evidence that is "shocking or heinous" and "likely to inflame the jury." Id. at 122 (internal quotation marks and citations omitted). Díaz's testimony does none of these things, and thus its admission was not unfairly prejudicial.

## 2. Rivas

### a. The Contested Testimony

Like Díaz, Rivas was also a member of the conspiracy who chose to cooperate with the government. Rivas's testimony focused mostly on Christopher. First, Rivas described an incident where Christopher had a "problem" because "some people . . . shot at his

car with his kids in it" while they were traveling near a bakery.
According to Rivas, in response to this attack, Christopher and
"Coquito" and "Monchi" -- two of the drug conspiracy's "triggermen"
-- went in search of the shooters.  Rivas testified that he knew
all three were armed because "[h]e was always armed every time that
they would go out to solve a problem" and "they weren't going out
to the shopping mall to look for clothing.  They were going out to
look for the enemy."

### b. **This Testimony Was Properly Admitted**

Like with Díaz's testimony, Defendants allege that
Rivas's testimony is both irrelevant and unfairly prejudicial.
However, neither of these objections was raised below, so we review
for plain error.[19]  See Ciresi, 697 F.3d at 26.  Once again, we find
no error.  Rivas's testimony is relevant because it helps to
establish that Christopher was a leader of the organization -- he
was targeted shortly after another leader was murdered and it is
unlikely that a low-level member of the organization would be
targeted for assassination -- and that the drug organization
resorted to violence to protect its territory.  Moreover, the fact
that Christopher and his men were armed provides proof of the

_____

[19]  Christopher did object to Rivas's statement that the men were
armed and his subsequent explanation as to how he knew this, but
the objection was based on a different ground.  See United States
v. Wallace, 461 F.3d 15, 35 n.11 (1st Cir. 2006) ("Because that
objection was on different grounds, however, we deem the
defendant's present argument of error, raised for the first time on
appeal, as unpreserved.").

conspiracy charged in Count Nine -- conspiracy to possess firearms in furtherance of a drug trafficking crime. See Fed. R. Evid. 401; Rivera Calderón, 578 F.3d at 95-96. And because the testimony was neither shocking, heinous, nor likely to inflame the jury, it need not have been excluded under Rule 403. See Varoudakis, 233 F.3d at 122.

### 3. Officer Vázquez

#### a. The Contested Testimony[20]

During Officer Vázquez's testimony, a video was played showing Christopher and others attending the funeral of Miguel Ruiz Sánchez ("Miguel") at the Housing Project. Officer Vázquez commented on the video, explaining that "[a]ccording to [his] investigation, Miguel Ruiz Sánchez was one of the leaders" of the conspiracy and that the reason some of the individuals were seen in the video picking up shell casings from the basketball court at the Housing Project was because "according to [their] investigation, the previous day they were having a wake . . . for Miguel Ruiz Sánchez inside the project." The officer then proceeded to identify one of the individuals in the video as Antero Rivero Marrero ("Rivero").

On cross-examination, Officer Vázquez testified that according to his investigation, Rivero "was serving as an escort"

---

[20] Defendants also challenge parts of Officer Vázquez's testimony as overview testimony. That is addressed in Part III.B.1, infra.

for Christopher because Christopher "feared for his life, and . . . was hot in the street."  On re-direct examination, the government asked Officer Vázquez about Rivero's escort services.  Officer Vázquez testified that Rivero had a fictitious license to escort dignitaries and agreed with the statement that no license would permit possession of the two AK-47 rifles that were seized from Rivero because it is not legal "to carry firearms to protect a drug trafficker."

### b.  **This Testimony Was Properly Admitted**

Defendants once again challenge the relevance and undue prejudice of this testimony.  Once again, our review is for plain error, and, once again, their challenge fails.  See Ciresi, 697 F.3d at 26.  Both pieces of evidence -- the picking up of the shell casings and the questioning into Rivero's escort services -- are relevant.

Regarding the shell casings, the evidence is relevant for two reasons.  First, the testimony connects Christopher with Miguel, who was known to be a leader of the drug organization.  By establishing that Christopher was sufficiently connected to Miguel to attend his funeral, the evidence supported the conclusion that the two were part of the same organization.  Second, the collection of the shell casings helps support the allegation that the organization used weapons (thus providing evidence of the gun-related conspiracy charge) and that the conspirators were familiar

with the firearms.  See Fed. R. Evid. 401; Rivera Calderón, 578 F.3d at 95-96.  Once again, nothing about this testimony was unfairly prejudicial.  See Varoudakis, 233 F.3d at 122.

As to the testimony regarding Rivero, the majority of this testimony was relevant for much the same reason as the testimonies already discussed: it helped establish Christopher's role as a leader in the organization since a low-level conspirator would likely not need the level of protection that Christopher needed.  And though the district court could have in its discretion applied Rule 403 to exclude Officer Vázquez's agreement that it was not legal for Rivero to "carry firearms to protect a drug trafficker," its failure to do so does not constitute plain error, especially given our "great deference" to a district court's 403 rulings.  See id.  In any event, this one comment was harmless given all of the other evidence presented.  See United States v. Landrón-Class, 696 F.3d 62, 68 (1st Cir. 2012).

### 4.  The Recorded Phone Calls

#### a.  The Contested Portions of the Calls

As mentioned above while discussing the disqualification of Cummings's counsel, two conversations involving Cummings were recorded while he was detained at the Metropolitan Detention Center ("MDC"), Guaynabo.  In both calls -- one on June 5, 2012, and one on July 14, 2012 -- Cummings spoke with Christopher, who had not yet been arrested.  Besides discussing the payments to Cummings's

counsel, the two also discussed whether Juan was looking for "Gordo" -- recall, this is Rivas's alias. Cummings informed Christopher that Juan was working in the kitchen at MDC, Guaynabo and had been looking for Rivas but was unable to find him. In addition, Cummings and Christopher spoke about the attack on Christopher and his family outside the bakery, specifically focusing on the fact that other members of their organization had advance knowledge of the attack and that there would be retaliation against those who shifted loyalties.

### b. **The Recordings Were Properly Admitted**

Juan objects to the admission of the two phone calls on hearsay grounds. Because he failed to object when the statements were first admitted and at the close of evidence, we review for plain error.[21] See Ciresi, 697 F.3d at 25-26 (holding that to preserve a challenge to the admission of co-conspirator statements, "a defendant must object on hearsay grounds when his or her coconspirator's statement is provisionally admitted and must renew the objection at the close of evidence"). We reject this challenge, as the calls were properly admitted as co-conspirator statements.

---

[21] Juan did initially object on Confrontation Clause grounds, but does not renew that objection on appeal. See Wallace, 461 F.3d at 35 n.11. Even if he had, that argument would fail as well, as co-conspirator statements are "by their nature, not testimonial," and thus not subject to the Confrontation Clause. Ciresi, 697 F.3d at 31; see also Bourjaily v. United States, 483 U.S. 171, 182 (1987).

Though hearsay evidence is generally inadmissible in criminal trials, Rule 801(d)(2)(E) of the Federal Rules of Evidence "provides that a statement made by a defendant's coconspirator 'during the course of and in furtherance of the conspiracy' may be introduced as the nonhearsay admission of a party opponent." Id. (quoting Fed. R. Evid. 801(d)(2)(E)).  For a statement to qualify, the declarant and the defendant must be members of a conspiracy when the statement was made and the statement must have been made in furtherance of the conspiracy.  Id.

The calls here meet both requirements.  As to the first, the government provided significant evidence that Juan, Cummings, and Christopher were all members of the same drug organization -- and thus the same conspiracy -- and there is nothing in the record to suggest that any Defendant affirmatively withdrew from the conspiracy.  See United States v. Piper, 298 F.3d 47, 52 (1st Cir. 2002) ("Where a conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has terminated." (internal quotation marks omitted)).

As to the second requirement, the calls did in fact further the ends of the conspiracy.  At the time of the calls, Cummings and Juan had been arrested but Christopher had not, and the evidence showed that the conspiracy was still ongoing at the Housing Project.  For example, Officer Vázquez testified that

surveillance continued until November 2012, months after the June and July telephone calls. Moreover, when Christopher was arrested, additional guns and drugs were seized, suggesting that the contraband seized in the earlier raids had been replenished. See United States v. Elwell, 984 F.2d 1289, 1293 (1st Cir. 1993) (finding a conspiracy to be ongoing and defendant to still be a part of it even after his arrest).

Given that the organization was still operating, the calls can reasonably be interpreted as promoting the conspiracy. Cummings and Christopher discussed how certain members of the conspiracy -- such as Rivas -- knew that Christopher was going to be attacked and that Christopher was contemplating retaliating against those who were disloyal. Maintaining loyalty from others clearly promotes the conspiracy. See Ciresi, 697 F.3d at 30 (finding that statements "served to placate . . . and forestall any dissension" were in furtherance of the conspiracy); Elwell, 984 F.2d at 1293.

The calls, therefore, properly qualify as co-conspirator statements and were thus properly admitted.

## B.  Overview Testimony

Next, Defendants claim that Officer Vázquez and Federal Bureau of Investigation ("FBI") Special Agent David James provided improper overview testimony. Overview testimony occurs, for example, when "a government witness testifies about the results of

a criminal investigation, usually including aspects of the investigation the witness did not participate in, before the government has presented supporting evidence." United States v. Rosado-Pérez, 605 F.3d 48, 55 (1st Cir. 2010). We have repeatedly condemned the use of such tactics, finding it "inherently problematic" for a number of reasons. United States v. Casas, 356 F.3d 104, 119 (1st Cir. 2004); see also United States v. Flores-De-Jesús, 569 F.3d 8, 14 (1st Cir. 2009). First, because it is possible that "evidence promised by the overview witness never materializes," Flores-De-Jesús, 569 F.3d at 17, the testimony "raises the very real specter that the jury verdict could be influenced by statements of fact or credibility assessments" not in evidence, Casas, 356 F.3d at 119. Second, it is similarly possible that subsequent testimony will differ from the assumptions of the overview witness. Id. at 119-20.

Though our concerns with overview testimony are applicable regardless of the witness involved, our skepticism is enhanced when the witness is a law enforcement official because "juries may place greater weight on evidence perceived to have the imprimatur of the government." Id. at 119. As we explained in Flores-De-Jesús, "overview testimony of a law enforcement official is not simply a repetition (at best) of other evidence. It is also, in effect, an endorsement of the veracity of the testimony that will follow." 569 F.3d at 18. Moreover, a law enforcement

-36-

official is likely to "express opinions as to defendants' culpability based on the totality of information gathered in the course of their investigation," even though the official did not have personal knowledge. Id. at 19 (alterations omitted) (internal quotation marks omitted). Such testimony is inadmissible and effectively serves to usurp the role of the jury because the witness's inference is based on the same circumstantial evidence presented to the jury. United States v. Meises, 645 F.3d 5, 16 (1st Cir. 2011).

With that background in place, we now turn to the contested testimony here.

### 1. Officer Vázquez

Defendants never objected that Officer Vázquez was providing overview testimony, and thus we review for plain error. Rosado-Pérez, 605 F.3d at 54.

#### a. The Contested Testimony

Officer Vázquez testified during the first two days of trial. In explaining his involvement in the investigation, Officer Vázquez told the jury that he led the Bayamón Strike Force which was tasked with, among other things, conducting video surveillance. This video surveillance, he explained, occurred over fifteen days. On twelve of those days, Officer Vázquez was either personally operating the camera or assisting a colleague in doing so; on the

other three days, Officer Vázquez was on the ground surveilling the Housing Project.

In addition to authenticating the clips from the fifteen-day surveillance, Officer Vázquez also described what the clips were portraying. He told the jury that the surveillance was directed toward "the site that we had identified as the drug point" and that the video clips represented "all persons that appear[ed] engaged in a criminal activity at that point in time." For each video clip, he would point out all of the individuals present -- noting their role in the drug organization -- as well as the controlled substances, firearms, and other objects which could be seen. For example, in one clip, Officer Vázquez explained to the jury that they were viewing Cummings holding "a package with a number of baggies inside with a white content." The rest of the clips contained similar commentary.

### b. This Testimony Was Not Overview Testimony

Contrary to Defendants' contention, this was not a "new variation" of overview testimony derived by the government. In fact, it was not "overview" testimony at all. Officer Vázquez was present at each and every surveillance -- either behind the camera or in front of it -- and thus was simply testifying about his own observations based on his personal knowledge. And while he did note the apparent roles each Defendant played in the organization, he never expressed an opinion as to their culpability. Cf. Flores-

De-Jesús, 569 F.3d at 19 ("When a law enforcement witness expresses opinions as to defendants' culpability based on the totality of information gathered in the course of their investigation, these conclusory statements often involve impressible lay opinion testimony . . . ." (alterations omitted) (internal citation and quotation marks omitted)).  Appropriate testimony does not become improper overview testimony just because one law enforcement official was present throughout the entire investigation and is then called to walk the jury through the investigation from beginning to end.  See United States v. Valdivia, 680 F.3d 33, 48 (1st Cir. 2012) ("[F]ar from being a scripted 'overview' of the government's case by uninvolved agents, the testimony represented the fruits of first-hand police work."); Rosado-Pérez, 605 F.3d at 55-56 (finding testimony to be proper where agent was lead investigator, participated in surveillance and controlled drug buys, and testified only on the basis of personal observations).

Moreover, none of the problems generally associated with overview testimony are present here.  Because Officer Vázquez was providing a first-hand account of his observations, while simultaneously playing the video clips of those surveillances, there is no concern that the evidence being testified to would never materialize.  Nor is there a worry that Officer Vázquez would make assumptions disputed by later testimony.  Cf. Flores-De-Jesús, 569 F.3d at 17; Casas, 356 F.3d at 119.

Accordingly, the testimony was proper.

### 2. <u>Agent James</u>

Unlike with Officer Vázquez, there was an objection to the district court's decision to allow Agent James to elaborate and clarify his testimony. Accordingly, our review is for abuse of discretion. <u>Rosado-Pérez</u>, 605 F.3d at 54.

### a. <u>The Contested Testimony</u>

Agent James was called as part of Christopher's case-in-chief in an attempt to discredit Rivas, one of the government's cooperating witnesses. Rivas had testified during the government's case that Christopher was a leader of the organization, but in a pre-trial interview with Agent James, Rivas had not named Christopher when listing the organization's leadership. Accordingly, Christopher's attorney asked the agent to read a paragraph from his interview report which had memorialized the conversation. After reading the paragraph, Agent James attempted to clarify the report. He explained (over Christopher's objection) that while the report reflected Rivas's initial interview, he "of course corroborated this with other intelligence." He then proceeded to summarize this intelligence:

> AGENT JAMES: [Rivas] did not know the name of this individual, but did identify his nickname as Negro. If I can provide some context to the Court.
>
> COURT: Sure.

AGENT JAMES: In these initial interviews, I had a binder that showed different pictures, and so I'd just show it and they would identify. So this is the number two of the ones whom I showed him whom Carlos Rivas identified.

So number two, he did not know the name of the individual, but identified his nickname as Negro. Negro is known to us as -- by law enforcement as Christopher Laureano Pérez. Negro is the other leader of the Residential Villas De Monterrey. Negro frequents Residential Villas De Monterrey more than Miguel. He visits Villas De Monterrey approximately three times a week or more. Miguel only visits approximately two times a week. He gives orders to the drug point. Negro is armed with a .50 caliber pistol. He saw him firing it on New Year's Eve. Negro was shooting it into the air.

Previously, some enemies of Residential Villas De Monterrey tried to kill Negro and his children in order to take over the Residential Villas De Monterrey drug point. Negro drives a black Toyota Carolla [sic], and also rides a gray and black scooter. He has a house probably in Naranjito or Barranquitas.

### b.   This Testimony Was Potentially Improper but Harmless

Unlike Officer Vázquez's testimony, this testimony was potentially problematic for two reasons. First, Agent James made clear that he was not testifying about his personal knowledge of "Negro" but rather was summarizing everything the investigation had uncovered. Second, the "context" he provided was well beyond the scope of the question asked.

Whether this qualifies as improper "overview testimony," however, is a determination we need not make because any error that

may have occurred was harmless. Agent James testified as part of Christopher's case-in-chief, well after the government had already rested. Thus, most -- if not all -- of the evidence Agent James referred to had already been introduced by other witnesses. At the very least, the government had provided evidence that Christopher and "Negro" were the same person and that there had been an attempt on Christopher's life. Given the timing of this testimony and the fact that the same evidence had previously been properly introduced, we are confident that this testimony did not affect the verdict, and thus the error was harmless. See United States v. Hall, 434 F.3d 42, 57 (1st Cir. 2006) (distinguishing other cases involving improper overview testimony in part because the officer "did not testify until near the end of the government's case-in-chief"); Casas, 356 F.3d at 121 (explaining that the admission of improper testimony is "harmless if it is highly probable that the error did not influence the verdict").

## C. Judicial Bias

Defendants next allege that numerous actions by the district court show that it was biased against them, and that this bias deprived them of a fair trial. When reviewing claims of judicial bias, we "must evaluate the judge's actions 'according to a standard of fairness and impartiality, recognizing that each case tends to be fact-specific.'" Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir. 1997) (quoting United States v. Polito, 856 F.2d 414, 418

-42-

(1st Cir. 1988)). That being said, it is important to consider "isolated incidents in light of the entire transcript so as to guard against magnification on appeal of instances which were of little importance in their setting." United States v. Candelaria-Silva, 166 F.3d 19, 35 (1st Cir. 1999) (internal citation and quotation marks omitted).

Here the allegations take three general forms: (1) endorsement of government witnesses through additional questions by the district court; (2) hostile statements made to Juan by the district court; and (3) adverse judicial rulings. These sorts of claims will only be successful if the party alleging bias can show "serious prejudice." Loque, 103 F.3d at 1045. After thoroughly reviewing the record, we reject the contention that these actions -- either taken independently or together -- rise to the level of legally cognizable judicial bias by the district court.

## 1. The Bolstering of Witnesses

Defendants first argue that the district court continually questioned witnesses and interjected comments which improperly bolstered their testimony, thus lessening the government's burden and evincing bias towards them. Because no Defendant objected to the district court's practice of asking questions or to any of its specific comments, we review for plain error. United States v. Fernández, 145 F.3d 59, 63 (1st Cir. 1998).

-43-

### a. Relevant Facts

During trial, the district court asked witnesses a number of questions and made a variety of comments. These included the following:

- During the testimony of cooperating witness Díaz, the district court asked "what are your obligations?" in relation to the cooperation agreement with the government. In response, Díaz stated that his obligation was "cooperation in telling the truth." He also testified that he had been offered "safety" and "security out in the street" in exchange for his cooperation. When Juan objected to the government's attempt to elaborate, the district court sustained the objection, stating that "it is self-explanatory" that "he cooperates, he needs security."

- During the testimony of cooperating witness Rivas, the district court interjected when the government asked what would happen if Rivas did not tell the truth. The court stated, "Do you understand that aside from that point, if you are caught lying, inventing, exaggerating, et cetera, you could face charges for perjury or for obstruction of justice, too?" Rivas acknowledged that "[e]verything would then be in the hands of the Judge" if he was caught lying, to which the district court responded "on top of that, you will always be in my hands, you understand me?" Finally, when Rivas revealed that he and the government had agreed on a sentence recommendation of sixty months, the district court again interrupted to make clear that it did not necessarily have to follow the recommendation.

- When the district court overruled an objection and allowed Officer Eric Rivera Figueroa ("Officer Rivera") to testify about how a "chip" converts a pistol into an automatic weapon, it explained its ruling by stating that "[t]his man has been a police officer dealing with firearms and drugs for years. He can tell us whether this is a chip or not." Similarly, the district court explained that it was allowing Rivera to show the jury how to use a magazine because "[h]e's in the police force, in the Bayamón Strike Force, deals with these issues every day of his life."

- When Officer María Cruz identified an item seized during the search as a "cleaning kit," the district court inquired what the kit was designed to clean.

- During the testimony of federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Agent Carlos González, the district court asked a number of questions related to the seized firearms. First, it asked what the purpose of shortening the AK-47 was, to which Agent González responded, "[t]he shorter you make a firearm, the easier it is to conceal." Second, it asked whether high-capacity magazines like the ones seized were legal to buy, to which the agent responded that they were. It followed this up by asking "a curious question" regarding the magazines: "When you guys go out on an operation, is this the kind of thing you use on your firearms?" When the agent responded in the negative, the district court said "[n]ot at all, right?"

- When Officer Rivera described the items he recovered during the search as "cylindrical plastic transparent

bottles, containers," the district court tried to clarify their description, asking if they were "[l]ittle bottles. It's like little bottles, correct?"

- In response to Officer Abizer Cotto Adorno ("Officer Cotto") identifying seized items as "cocaine vials," the court interjected, clarifying that the officer did not actually know what was inside the vials.

### b. **The District Court Did Not Improperly Endorse Witnesses**

"It is well-established that a judge is not a mere umpire" and accordingly "has a perfect right -- albeit a right that should be exercised with care -- to participate actively in the trial proper." United States v. Ofray-Campos, 534 F.3d 1, 33 (1st Cir. 2008). This includes asking questions "to elicit facts to facilitate a clear presentation of the issues." United States v. Meléndez-Rivas, 566 F.3d 41, 50 (1st Cir. 2009) (internal quotation marks omitted). Still, a district court needs to "be balanced; [it] cannot become an advocate or otherwise use [its] judicial powers to advantage or disadvantage a party unfairly." Id. (internal quotation marks omitted). So as long as the court "preserves an attitude of impartiality and guards against giving the jury an impression that the court believes the defendant is guilty," it may question witnesses. United States v. Rosario-Peralta, 199 F.3d 552, 560 (1st Cir. 1999).

-46-

Here, Defendants point to the district court's comments during the testimonies of Díaz, Rivas, Officer Rivera, Officer Cruz, and Agent González to support their claim of bias. However, Defendants conveniently ignore the district court's comments and questions to Officer Rivera and Officer Cotto and its question to Agent González regarding the legality of purchasing high-capacity magazines which show a much more balanced approach to questioning.

Taken together, these questions and comments show that the district court asked questions which were helpful (and unhelpful) to both sides. For example, it asked Agent González about the purpose of shortening firearms and whether it was common law enforcement procedure to use high-capacity magazines (questions unhelpful to Defendants), but it also asked him whether those same high-capacity magazines were legal to buy (a question helpful to Defendants). And while it questioned Officer Cruz as to the purpose of the recovered cleaning kit (a question unhelpful to Defendants), it also corrected Officer Cotto's statement that he recovered "cocaine vials" by interjecting that the officer did not actually know what was inside (a question helpful to Defendants). We view these questions as a legitimate attempt to clarify testimony and focus the presentation of evidence, and not an

indication of a district court using its powers to unfairly disadvantage Defendants.[22]  See Meléndez-Rivas, 566 F.3d at 50.

We also disagree with Defendants that reminding the cooperating witnesses of their requirement to be truthful was "bolstering the prosecution."  If anything, these warning should help Defendants, since if the witnesses had a motivation to lie -- which is the focus of the typical cross-examination of a cooperating witness -- the district court's comments could have scared the witnesses into telling the truth.  The same can be said for the district court's action of sustaining Juan's objection to the government's attempt to follow up on Díaz's "safety" comment.

Similarly, we fail to see how the district court was bolstering the prosecution by explaining its reasoning for finding Officer Rivera and Agent González qualified to answer the government's questions.  There is a difference between objectively stating the officer's qualifications to answer a question on the one hand and suggesting that the officer's testimony is to be given enhanced weight and credibility because of these qualifications on the other.  Here, the district did the former while avoiding the latter.

---

[22]  We also note that the district court's questioning was isolated, occurring only a handful of times over an eight-day trial.  Cf. United States v. Ayala-Vázquez, 751 F.3d 1, 19-20, 25 (1st Cir. 2014) (finding a district court's questioning to not be improper where there were twenty-three comments over four days of an eighteen-day trial).

While all of these interjections may have highlighted issues Defendants would rather the jury not have focused on, that does not mean that the district court improper bolstered witnesses, nor does it indicate bias.  See Rosario-Peralta, 199 F.3d at 560.

Finally, we add that even if the questions did mistakenly give the jury an impression of bias, cf. United States v. Rivera-Rodríguez, 761 F.3d 105, 121 (1st Cir. 2014), any prejudice was cured by the district court in its closing instructions, where it specifically instructed the jury on this issue:

> I have an obligation as a judge to get immersed in questioning if I think I should, but you should not ever take from any question that I [m]ake or from anything that I say or do an inclination or indication on my part as to what the result of the case should be. That is not the purpose.  The purpose is to try to give you the best quality of evidence possible.  You are at liberty to disregard any question, any comment that I may have made in the context of this case.

We have previously held that similar jury instructions were sufficient to dispel any impressions that a district court's questioning may have caused, and we see no reason to depart from those holdings here.  See Ayala-Vázquez, 751 F.3d at 25, 26; Rivera-Torres v. Ortiz-Vélez, 341 F.3d 86, 100 (1st Cir. 2003); cf. Meléndez-Rivas, 566 F.3d at 51 n.10 ("There was, for example, no instruction that the jury should not assume the court had any view on the subject of the court's questions and that the jury could disregard all the court's questions.").

## 2. **The District Court's Admonitions to Juan**

Juan also argues that the district court was specifically biased against him.

### a. **Relevant Facts**

Once during jury selection and again during the trial, the district court observed Juan staring at the jury. Thinking that this was an attempt to intimidate them, the district court sent Juan's counsel a note warning Juan not to stare at the jury. Also during the trial, Juan alerted the district court that he believed the prosecutor was making improper hand signals to witnesses. When the issue was discussed outside the presence of the jury, the district court rejected the allegation, telling Juan that it was observing the prosecutor and it did not see any improper signaling. Juan was unconvinced, and asked the court for permission to "raise his hand" when he saw the prosecutor making these signals. The district court was having none of it, though, and chastised Juan for this request. It told Juan to not even think about it and threatened that if he "dare[d] to disrupt th[e] courtroom," the district court would "force" Juan into his chair or make him watch the trial "in front of a TV set in the jail."[23]

---

[23] While the district court forbade Juan from disrupting proceedings by raising his hand, it did offer Juan the opportunity to file a motion regarding the alleged hand gestures. Juan declined to do so.

## b.    These Admonitions Did Not Evince Bias

"[J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." Liteky v. United States, 510 U.S. 540, 555 (1994).  There is a difference "between expressions of impatience, annoyance or ire, on the one hand," which are permissible, "and bias or partiality, on the other hand," which are forbidden. Candelaria-Silva, 166 F.3d at 35 (internal quotation marks omitted).

Here, the allegations raised by Juan fall into the former category.  Both actions -- warning Juan not to stare at the jury and prohibiting him from "raising his hand" in the middle of questioning by the government -- are simply efforts at courtroom administration which are well within the district court's discretion.  Liteky, 510 U.S. at 556.  Even the district court's alleged threat that if Juan "dare[d] to disrupt th[e] courtroom," the district court could "force" Juan into his chair or make him watch the trial "in front of a TV set in the jail" is nothing more than an attempt to get Juan to behave and not disrupt proceedings. To be sure, these admonishments are stern and somewhat harsh.  But that alone is insufficient to establish bias.  See id. ("A judge's ordinary efforts at courtroom administration -- even a stern and

-51-

short-tempered judge's ordinary efforts at courtroom administration -- remain immune."); Candelaria-Silva, 166 F.3d at 35.

Moreover, the district court went out of its way to ensure that the jury did not become aware of these admonishments -- it sent notes to Juan's counsel instructing Juan not to stare at the jury, and the discussion involving Juan raising his hand occurred at a sidebar. Given this discretion, we fail to see how Juan was prejudiced by the comments. See Candelaria-Silva, 166 F.3d at 35 ("[A] trial judge's frustration displayed at sidebar does not deprive a defendant of a fair trial."); Loque, 103 F.3d at 1046 (holding that a statement made outside "the presence of the jury does not irretrievably taint the trial").[24]

### 3. The District Court's Treatment of Alleged Improper Jury Contact

Finally, Juan and Cummings (through his supplemental pro se brief) also contend that the district court was biased in its

---

[24] Unconnected to any particular concern about these admonitions, Juan also contends that the district court was biased based on statements that Juan says show it had "formed an opinion with regards to the ultimate issue of [Juan's] guilt." Juan bases that contention on statements the district court made late in the trial -- out of the hearing of the jury -- including telling Juan that Juan was "in charge in Villas De Monterrey." Even if these statements could be taken to suggest that the district court had by that point formed an opinion as to Defendants' guilt, the law is clear that a judge who over the course of the trial becomes "exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person," is "not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings . . . ." Liteky, 510 U.S. at 550-51.

treatment of Juan's allegation of improper contact between the prosecutor and a juror.

### a. **Relevant Facts**

During trial, Juan's counsel advised the district court of an alleged prohibited contact between the prosecutor and a juror in the cafeteria in which the two discussed the weapons in the case. In response, the district court questioned the prosecutors and the court security officer, all of whom denied the contact. It also agreed to hear the testimony of a witness, but would only do so in open court since the public had a right to know what was occurring. When Juan's counsel proffered that the witness was unwilling to do so (but would testify to the court in chambers), the district court denied the motion, finding the allegation was unsubstantiated and "smells like a red herring." It added that "it is natural for somebody who is in that circumstance to try to do whatever it takes to try to derail the procedure" and that it would "believe the word of an official Assistant U.S. Attorney, two of them, that says this did not happen."[25]

---

[25] These comments were based, at least in part, on the fact that the alleged conversation -- that the juror allegedly told the Assistant U.S. Attorney that he "would sign[] whatever was necessary for the weapons that were in evidence" -- does not even make sense. For that reason, the district court did not clearly err in concluding that no inappropriate contact had occurred, and so we also reject Cummings's pro se argument that this incident deprived him of an impartial jury.

### b. The District Court's Treatment of the Allegation Did Not Evince Bias

There is nothing here to suggest bias on the part of the district court. The court took the allegation seriously and was willing to hold a hearing. It questioned the Assistant U.S. Attorney and the court security officer, and it was willing to question another witness as well. That the district court refused to close the courtroom to question this witness does not show bias; rather, it is just an example of the district court exercising its "wide discretion to determine the scope of [a] resulting inquiry and the mode and manner in which it will be conducted." United States v. Paniagua-Ramos, 251 F.3d 242, 250 (1st Cir. 2001). Juan and Cummings simply disagree with the court's resolution of the issue, which is insufficient to establish bias. See Liteky, 510 U.S. at 555 ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion.").

### 4. The Cumulative Effect of These Circumstances Did Not Evince Bias

Even though each of the allegations raised by Defendants does not, on its own, show bias, we must still consider whether these allegations in the aggregate demonstrate judicial bias. See Candelaria-Silva, 166 F.3d at 35; Logue, 103 F.3d at 1045. After a thorough review of the record, we are convinced that they do not. These isolated events, none of which showed bias, did not somehow combine to create such a biased atmosphere that Defendants were

deprived of a fair trial. Accordingly, we reject Defendants' arguments regarding judicial bias. And because we find no credible claim for judicial bias, the district court did not abuse its discretion in denying Defendant's recusal motion due to bias. See United States v. Pulido, 566 F.3d 52, 62 (1st Cir. 2009) ("We review a ruling on a motion to recuse for abuse of discretion . . . . [and] will sustain the district court's ruling unless we find that it cannot be defended as a rational conclusion supported by [a] reasonable reading of the record." (internal quotation marks omitted)).

## D. The Sufficiency of the Evidence for Cummings's Machinegun Convictions

Counts Five and Six of the superseding indictment charged Cummings with illegal possession of a machinegun and possession of firearms (including machineguns) in furtherance of a drug trafficking crime, respectively. Cummings challenges his convictions on these counts, arguing that the evidence was insufficient to establish his knowledge that the firearms were machineguns. We review these sufficiency claims de novo. United States v. Shaw, 670 F.3d 360, 362 (1st Cir. 2012).

### 1. Relevant Facts

On May 2, 2012, while executing a search warrant at the Housing Project, law enforcement officials discovered a closed red and black bag in Cummings's apartment. The bag contained four firearms, two of which were .40-caliber Glock pistols with visible,

external chips which converted the pistols into automatic firearms. During his subsequent interrogation, Cummings admitted that he often "stored weapons and drugs for the organization" and was going to be paid "around $400" for storing this particular bag.  At trial, Rivas, one of the cooperating witnesses, testified that he had seen Cummings testing fully automatic weapons, including a black pistol which was "either a .40 or .45" caliber.

## 2.   **The Evidence Was Sufficient to Convict Cummings**

In reviewing claims of insufficiency, "we consider the evidence, including all reasonable inferences drawn therefrom, in the light most favorable to the jury's verdict." Id.  So long as "any reasonable jury could find all the elements of the crime beyond a reasonable doubt, we must uphold the conviction." United States v. Lizardo, 445 F.3d 73, 81 (1st Cir. 2006).

Here, Cummings concedes that the evidence established that he possessed firearms and possessed firearms in furtherance of a drug-trafficking crime.  He argues, however, that the evidence was insufficient to establish the additional element that he knew the firearms had been modified to fire automatically, thus bringing them under the definition of a machinegun.  See United States v. Nieves-Castaño, 480 F.3d 597, 599 (1st Cir. 2007) (explaining that to convict under 18 U.S.C. § 922(o), the "government must . . . prove beyond a reasonable doubt that the defendant knew the weapon had the characteristics that brought it within the statutory

definition of a machinegun." (internal quotation marks omitted)).
According to Cummings, the government provided no evidence that he
opened up the bag or was told what the bag contained, and thus
there is no evidence to show that he knew the guns were machineguns
and not regular firearms.

Though a close call, we disagree.  This case is quite
similar to a previous case, United States v. Azubike, in which a
defendant convicted of conspiracy to possess with the intent to
distribute narcotics argued that while the evidence established
that he knew the suitcase he was transporting contained something
illegal, the evidence was insufficient to prove beyond a reasonable
doubt that he knew the suitcase contained a controlled substance.
564 F.3d 59, 61-62, 64 (1st Cir. 2009) ("Azubike II"); 504 F.3d 30,
32-36 (1st Cir. 2007) ("Azubike I").  Two separate panels of this
court upheld the conviction on sufficiency of the evidence
grounds,[26] explaining that a number of factors and inferences made
it possible for a jury to conclude that Azubike would likely have
known the contents.  These included a recorded phone conversation
in which Azubike did not want to talk about the "stuff" over the
phone, the close relationship between Azubike and the conspiracy's

---

[26] Azubike's first conviction was upheld on sufficiency grounds but
reversed due to prosecutorial misstatements during closing
arguments.  Azubike I, 504 F.3d at 36, 40-42.  After Azubike was
convicted a second time, we once again concluded that the evidence
was sufficient to support the conviction.  Azubike II, 564 F.3d at
64-66.

leaders, the fact that Azubike was entrusted with a large amount of drugs (thus suggesting he was trustworthy), and the modus operandi of the crime. Azubike II, 564 F.3d at 64-65; Azubike I, 504 F.3d at 37-38.

Many of those same factors are present here. First, Cummings admitted during his interrogation that he often stored guns and drugs for the organization. The repetitive nature of this process (his modus operandi) could lead a jury to infer that simply by being handed the bag and being told how much he would be expected to be paid, Cummings would understand what the bag contained.

Second, the fact that Cummings had stored weapons and drugs before suggests that he was trusted by his co-conspirators, and positions of trust often come with increased access to information. See Azubike I, 504 F.3d at 37 ("[A] reasonable inference of knowledge arises when the defendant is trusted with possession of a large amount of drugs. This is because drug organizations do not usually take unnecessary risks by trusting critical transactions to outsiders."); see also Azubike II, 564 F.3d at 65.

Third, the evidence established that Cummings and Christopher -- one of the leaders of the organization -- were close. First, remember the phone calls between Christopher and Cummings while Cummings was incarcerated. Not only did Christopher

attempt to pay for Cummings's counsel, but he also confided in Cummings that he believed members of the organization knew that Christopher was going to be targeted, and that retribution would be taken on those who were not loyal. Second, Díaz testified that he would use Cummings's car when going on rounds for Christopher. That Cummings was willing to give up his car so that Christopher could order these activities further supports a close relationship between the two. Given this apparent closeness, a jury could rationally conclude that Christopher would have confided in him regarding the details of the bag. See Azubike II, 564 F.3d at 64-65; see also Azubike I, 504 F.3d at 37.

Finally, Rivas testified that Cummings had tested the organization's weapons in the past and had been seen firing .40 or .45 caliber black pistols which had been modified to fire automatically shortly before Cummings was given the bag seized during the May 2 search. Given that Cummings had been seen with machineguns previously, a reasonable jury could infer that Cummings knew that these were the types of guns he was being asked to safeguard.[27]

_____

[27] This last point is the key difference between the present case and Nieves-Castaño, the case relied upon by Cummings. In Nieves-Castaño, we found insufficient evidence of knowledge because the modifications to make the gun fire automatically were all internal and there was no evidence that the defendant was knowledgeable about firearms or had fired the AK-47 rifle previously. 480 F.3d at 600-02. Here, by contrast, the government presented evidence that Cummings had a practice of storing firearms for the organization and had been seen testing automatic weapons shortly

Though far from the strongest of cases, we believe that the cumulation of all of this circumstantial evidence is just enough to sustain the jury's verdict. See Shaw, 670 F.3d at 362 ("Individual pieces of evidence viewed in isolation may be insufficient in themselves to prove a point, but in cumulation may indeed meet the mark."). Accordingly, we reject Cummings's challenge.

## E. The Courtroom Closings

Christopher, meanwhile, also argues that the district court violated his Sixth Amendment right to a public trial when it removed his wife and children from the courtroom. We review this allegation de novo. United States v. DeLuca, 137 F.3d 24, 32-33 (1st Cir. 1998).

### 1. Relevant Facts

During the fourth day of trial, the district court ordered that Christopher's wife and two minor children -- aged ten and fourteen -- be removed from the courtroom. Christopher's counsel learned of this exclusion after the day had ended, so he brought the issue to the district court's attention at the start of day five. Upon raising the issue, the district court acknowledged that it had ordered all three family members removed, stating that they had been disruptive. Regarding Christopher's wife, the

before the search. Thus, while there was no evidence from which to infer knowledge in Nieves-Castaño, there was here.

-60-

district court explained that it had observed her "moving her lips" at the witness with "great distaste" and that the witness had seen her doing so.  As to the children, the district court explained that they "were disrupting a little bit."  It added that it "d[id]n't want the children here, because this is not a place for children . . . . [to] listen to th[ese] kind of conversations that are recorded, nor to see drugs distributed at a drug point . . . . [b]ecause I don't think that -- nobody should validate or let children be exposed to that to begin with."  It went on to note that it would "never let a child of mine listen to this thing, nor hear the language spoken on this tape."

After hearing this explanation, Christopher's counsel asked if Christopher's wife was barred from returning, to which the district court responded in the negative.  The court instructed Christopher's counsel that if Christopher's wife "wants to come in and behave like a person should . . . and stay seated and put," then she could come back.  However, it warned that a court officer would be seated behind Christopher's wife and "if this happens again, [the court will] get her out, and she will be banned forever."  Christopher's counsel never asked if the children could return, nor did he object to their continued exclusion.

### 2.  <u>Christopher's Sixth Amendment Right Was Not Violated</u>

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and

-61-

public trial." U.S. Const. amend. VI. This right was "'created for the benefit of the defendant,' as openness in criminal proceedings 'encourages witnesses to come forward,' 'discourages perjury,' and 'ensure[s] that judge and prosecutor carry out their duties responsibly.'" Bucci v. United States, 662 F.3d 18, 22 (1st Cir. 2011) (quoting Waller v. Georgia, 467 U.S. 39, 46 (1984)).

Accordingly, closing a criminal trial to the public is rare, and before a closure is permitted, a four-part inquiry must be satisfied:

> [1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure.

Id. (citing Waller, 467 U.S. at 48).

This test, however, applies to total closures -- where all members of the public are excluded during some portion of the trial. Id. "In partial closures -- i.e., where courtroom access is restricted but some members of the public are permitted to attend -- this court and several of our sister circuits have held that a 'substantial' interest, rather than a 'compelling' one, will justify [a] partial closure." Id. Because only Christopher's wife and children were removed from the courtroom, we analyze the

exclusions under the modified <u>Waller</u> test for partial closures.[28]
<u>Id.</u> at 27.

### a. Christopher's Wife

The exclusion of Christopher's wife complied with the modified <u>Waller</u> test. First, the district court explained that it observed Christopher's wife making faces and mouthing words of disapproval at the witness, and that the district court believed that the witness saw these actions. We agree that such actions could be seen as an attempt at witness intimidation, and the prevention of witness intimidation is clearly a "substantial" interest. <u>See</u> <u>Martin</u> v. <u>Bissonette</u>, 118 F.3d 871, 873 (1st Cir. 1997) (upholding the exclusion of defendant's family members during the reopening of a witness's testimony where the witness stated that her initial testimony had been untrue because she had been given looks by defendant's family and felt intimidated); <u>United States</u> v. <u>Brazel</u>, 102 F.3d 1120, 1155-56 (11th Cir. 1997) (requiring that the public identify themselves before entering the courtroom constituted a partial closure but was permissible because the district court observed individuals coming into the courtroom and staring at witnesses); <u>Woods</u> v. <u>Kuhlmann</u>, 977 F.2d 74, 77-78 (2d Cir. 1992) (upholding a partial, temporary closure where

---

[28] We reject the government's argument that there was never a closure of any kind. Christopher's wife and children were removed from the courtroom and forbidden from returning on that day. The courtroom was closed to them, and thus a partial closure existed.

defendant's family was excluded because, after observing the family members and the witness and having a brief exchange with the witness, the district court believed family members were intimidating witnesses).

Second, we believe that the district court's requirement that Christopher's wife leave until she promised to behave herself was "no broader than necessary" to protect this substantial interest. As soon as Christopher's wife stopped mouthing words and staring at witnesses, she was to be allowed back in, and thus, the removal was "neither broader nor longer than was reasonably necessary to end this . . . harassment and secure the witness's accurate testimony." Martin, 118 F.3d at 875.

Third, while it would have been better for the district court to have explicitly stated that it had considered reasonable alternatives to removing Christopher's wife, we have previously held that such a consideration can be implicit. See id. at 875 & n.4. This is especially true here, where no reasonable and less-broad alternative existed. Christopher suggests that the court should have publicly admonished his wife and warned her to stop before removing her, as opposed to making that a condition for reentry, and that it should have questioned the witness to determine whether he had seen Christopher's wife's actions and been intimidated by them. However, we believe neither of these alternatives to be reasonable under the circumstances. The

district court was concerned that the witness was being intimidated and wanted to take action to ensure that that did not happen. Had the court stopped the proceedings, questioned the witness, and scolded Christopher's wife, all this would have done is disrupt the proceedings, draw attention to the situation, and possibly even enhance the intimidation felt by the witness. "Nothing in Waller or in any other case cited by [Christopher] suggests that a trial judge, presented with evidence of . . . witness intimidation . . . must undertake an assessment of the exact level of affrightment . . . before closing a courtroom." Id. at 875. In fact, the law is to the contrary. See id.

Finally, as already explained, the district court informed Christopher's counsel that Christopher's wife was removed because she was staring at the witness "moving her lips" with "great distaste" and that the witness had seen her doing so. This is an adequate finding to support the partial closure. See Martin, 118 F.3d at 873; Brazel, 102 F.3d at 1155-56; Kuhlmann, 977 F.2d at 77-78.

Accordingly, the exclusion of Christopher's wife during the fourth day of trial met the modified Waller test and did not violate Christopher's Sixth Amendment right to a public trial.

### b. Christopher's Children

In stark contrast to his wife's exclusion, where Christopher's counsel asked specifically whether she was barred and

if she could return, Christopher's counsel remained silent with regards to Christopher's children and never sought to have them readmitted. This silence is fatal to Christopher's claim. When the "subject matter [is] unmistakably on the table, and the defense's silence is reasonably understood only as signifying agreement that there was nothing objectionable," the issue is waived on appeal. United States v. Christi, 682 F.3d 138, 142 (1st Cir. 2012); see also United States v. Acosta-Colón, 741 F.3d 179, 187 (1st Cir. 2013) ("The judge put the exclusion matter squarely on the table for all the defendants' lawyers at sidebar . . . . Each attorney had the chance to speak up. . . . So [defendant's counsel's] silence constitutes classic waiver . . . ."); Martineau v. Perrin, 601 F.2d 1196, 1199-1200 (1st Cir. 1979). Given that the closure issue was front-and-center -- indeed, it was the entire point of the colloquy -- Christopher's counsel's silence as to Christopher's children can only be understood as implicit agreement that they should remain barred from the courtroom. Accordingly, this argument is nothing but an "afterthought on appeal," and thus waived. See Levine v. United States, 362 U.S. 610, 619-20 (1960) ("Due regard generally for the public nature of the judicial process does not require disregard of the solid demands of the fair administration of justice in favor of a party who, at the appropriate time and acting under advice of counsel, saw no

disregard of a right, but raises an abstract claim only as an afterthought on appeal.").

We pause for a moment, however, to sound a note of caution.  A defendant has a clear right to have his family present during proceedings -- and we know of no exception for minor children.  See United States v. Negrón-Sostre, --- F.3d ---, Nos. 10-1974, 10-2042, 10-2055, 10-2057, 10-2129, 2015 WL 3898794, at *1 (1st Cir. Jun. 25, 2015) ("[W]ithout exception all courts have held that an accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged." (quoting In re Oliver, 333 U.S. 257, 271-72 (1948) (internal quotation marks omitted))); see also United States v. Rivera, 602 F. App'x 372, 377 (9th Cir. 2015); Downs v. Lape, 657 F.3d 97, 108 (2d Cir. 2011) (Chin, J., dissenting).  Whether any individual child should be allowed to observe proceedings and possibly be exposed to harsh language, violence, and other untoward situations is a decision for that child's parents, not for the district court.[29]  The court's troubling blanket view that the courtroom was "not a place for children" is not only overly paternalistic, but also potentially in contradiction with the Sixth Amendment.

---

[29]  Indeed, the child's parents may find such observation to have educational benefits despite the adult themes.  Observing the judicial system in action can be a valuable civics lesson for a person of any age, and especially for an adolescent.

**F.  Cumulative Error**

Finally, Defendants argue that even if no single error warrants reversal, the cumulative effect of these errors form an "interconnected web of unfairness."  While we agree that "[i]ndividual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect," United States v. Sepúlveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993), that is not the situation presently before us.

Defendants allege a host of errors, but only one has any potential merit: Agent James's testimony as to Christopher's involvement in the conspiracy which was both beyond his personal knowledge and beyond the scope of the question asked.  But as we discussed above, any error was harmless.  And there can be no "cumulative" error when multiple errors do not exist.  See United States v. DeSimone, 699 F.3d 113, 128 (1st Cir. 2012) ("The cumulative error doctrine is of no use to [defendant] because the only identified error was harmless."); United States v. Stokes, 124 F.3d 39, 43 (1st Cir. 1997) ("By definition, cumulative-error analysis is inappropriate when a party complains of the cumulative effect of non-errors.").

## IV.  Sentencing Issues

In addition to attacking their convictions, Cummings and Christopher also challenge their sentences.  We review these challenges under a deferential abuse-of-discretion standard, the

goal being to ensure that the sentence "is both procedurally sound and substantively reasonable." United States v. Trinidad-Acosta, 773 F.3d 298, 308 (1st Cir. 2014) (quoting United States v. Dávila-González, 595 F.3d 42, 47 (1st Cir. 2010)) (internal quotation marks omitted); see also United States v. Maisonet-González, 785 F.3d 757, 762 (1st Cir. 2015). Because both Defendants only challenge the procedures by which the district court arrived at their respective sentences, that is where we focus our discussion.

A sentence is procedurally sound so long as the district court complies with the "'specifically delineated roadmap'" we have previously laid out. United States v. Serunjogi, 767 F.3d 132, 142 (1st Cir. 2014) (quoting United States v. Madera-Ortiz, 637 F.3d 26, 29 (1st Cir. 2011)). This entails calculating the applicable Guidelines Sentencing Range ("GSR"), addressing any objections to the probation department's Presentence Investigation Report ("PSR"), giving both parties an opportunity to argue for whatever sentence they deem appropriate, considering the 18 U.S.C. § 3553(a) sentencing factors, and explaining the reasoning behind the chosen sentence. See Gall v. United States, 552 U.S. 38, 49-50 (2007). Deviations from this roadmap -- such as "failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the section 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" -- constitute

procedural error.  <u>Trinidad-Acosta</u>, 773 F.3d at 309 (internal quotation marks omitted); <u>see also</u> <u>Gall</u>, 552 U.S. at 51.  Though our overall review of a sentencing is for abuse of discretion, this standard is actually multifaceted: "[W]e review factual findings for clear error, arguments that the sentencing court erred in interpreting or applying the guidelines <u>de novo</u>, and judgment calls for abuse of discretion simpliciter."  <u>Serunjogi</u>, 767 F.3d at 142 (alteration in original).  Notably, when a defendant is convicted of more than one count, a district court is expected to render a separate sentence on each count.  <u>United States</u> v. <u>Zavala-Martí</u>, 715 F.3d 44, 51 n.6 (1st Cir. 2013).

## A.  Cummings's Sentence

In his supplemental pro se brief, Cummings argues that his sentence was procedurally flawed because the district court erred in calculating the Base Offense Level for Count Seven (the drug conspiracy conviction).  Specifically, Cummings contends that he was not automatically responsible for all of the drugs involved in the conspiracy simply because he was convicted as a co-conspirator, and the district court's failure to make an individualized finding as to the amount specifically attributable to him was error.  This argument, while right on the law, is wrong on the facts.

Under the Sentencing Guidelines, a defendant's Base Offense Level for drug offenses depends mostly on the quantity of

the drugs involved in the offense. U.S.S.G. § 2D1.1(c). Accordingly, in order to properly calculate the GSR, the district court must first make "an individualized finding as to drug amounts attributable to, or foreseeable by, that defendant." United States v. Vázquez-Larrauri, 778 F.3d 276, 291 (1st Cir. 2015) (internal quotation marks omitted). Drug amounts are foreseeable to a co-conspirator so long as he or she "could reasonably have anticipated [the drugs] would be within the ambit of the conspiracy." United States v. Santos, 357 F.3d 136, 140 (1st Cir. 2004) (citing U.S.S.G. § 1B1.3(a)(1)(B) cmt. 2).

Here, the PSR attributed over 538,000 kilograms of marijuana equivalent[30] to Cummings, qualifying him for the highest Base Offense Level -- Level 38. U.S.S.G. § 2D1.1(c). When Cummings objected to this calculation, the district court rejected his argument, responding that "no matter how you look at this, in the context of what the conspiracy rules are and foreseeability and all of that, he's a[n offense] level [of] 38." Though perhaps not the clearest or most detailed of explanations, this statement shows that, contrary to Cummings's contention, the district court did

---

[30] Under the Sentencing Guidelines, when multiple drugs are involved, the quantity of each drug is converted into its marijuana equivalent and then added together to obtain the total drug quantity. See U.S.S.G. § 2D1.1; United States v. Ventura, 353 F.3d 84, 87 (1st Cir. 2003).

consider whether or not the entire drug amount was individually attributable to Cummings, and the court concluded that it was.[31]

Because the district court did address the drug quantity attributed to Cummings, we are left to determine whether the court committed clear error in adopting the PSR's finding. It did not. The evidence showed that Cummings was an enforcer in the organization, sometimes delivered drugs, and would often store drugs for the conspiracy. With all of these roles, Cummings could reasonably have anticipated that such a large quantity of drugs would be involved in the conspiracy, and thus there is no error in concluding that that entire amount was foreseeable to him. See Santos, 357 F.3d at 140.

In any event, even if the district court had failed to make an individualized finding, the error would have been harmless. See Vázquez-Larrauri, 778 F.3d at 291 (explaining that in order to vacate a sentence, a defendant must show that an error occurred and

---

[31] At the very least, the statement suggests the district court believed the amount to be a fair approximation of the drug quantity given the huge discrepancy between the threshold amount of marijuana equivalency and the amount attributed to Cummings in the PSR. See United States v. Mullins, 778 F.3d 37, 42 (1st Cir. 2015) (explaining that a district court need not make an exact finding as to drug quantity but rather may base its calculation on "approximations," so long as those approximations "represent reasoned estimates of drug quantity." (internal quotation marks omitted)). Cummings's counsel seemed to concede this point during the sentencing hearing, agreeing that since the PSR attributed 538,000 kilograms of marijuana equivalent to Cummings and the threshold for the Base Offense Level of 38 was 30,000 kilograms, there was no point "quibbling at the margins."

that it affected the defendant's substantial rights).  The verdict form convicting Cummings explicitly found that at least 280 grams of narcotics were involved in the conspiracy, thus triggering a ten-year mandatory minimum sentence.  See 21 U.S.C. § 841(b)(1)(A)(iii).  Since Cummings was only sentenced to 120 months (or ten years) on this count, his sentence would have been the same regardless of the individualized drug finding.

Accordingly, Cummings's sentence was procedurally sound.

## B.  Christopher's Sentence

Christopher was convicted on Count Seven -- the drug conspiracy -- and Count Nine -- conspiracy to possess firearms in furtherance of a drug trafficking crime -- of the superseding indictment, and the district court imposed a joint "life sentence." Christopher argues that this sentence was procedurally flawed for a number of reasons.

First, he contends that the district court relied on the PSR for a different defendant, and thus the district court's sentence was tailored towards another defendant, and not Christopher.  This argument is easily dispensed with.  Though the district court did initially have the wrong PSR in front of it, this mistake was quickly corrected.  By the time the district court made its comments regarding the Guidelines calculation and imposition of sentence, it had been given and had reviewed the

correct PSR.  Thus, the sentence was individually tailored to Christopher.

Second, Christopher argues that the district court failed to consider his objections to the GSR calculation on his drug conspiracy conviction (Count Seven), and that this failure resulted in an incorrect calculation.  At the outset of the sentencing proceedings, the district court asked if there was "any objection that survives," to which Christopher responded that he had filed a sentencing memorandum containing all of his arguments for an eighteen-to-twenty-year sentence.  The district court replied, "Okay.  Very well" and made no other specific reference to the memorandum.  Later in the proceedings, however, the district court stated "the calculations regarding drugs are totally correct, and there's no objection about that."  This latter statement was clearly erroneous, as Christopher had indeed objected to the calculation in his sentencing memorandum and had told the district court as much earlier in the proceeding.

This misstatement, however, was harmless because Christopher's objection was legally incorrect.  Christopher contended that under Alleyne v. United States, 133 S. Ct. 2151 (2013), the jury was required to find the specific drug quantity he was responsible for, so any drug findings by the district court (or in the PSR) could not be considered.  However, all Alleyne requires is for the jury to find that the amount of drugs is greater than

-74-

that necessary for the mandatory minimum in order for that mandatory minimum to be imposed. See United States v. Razo, 782 F.3d 31, 40 (1st Cir. 2015) ("[Alleyne] held that a jury finding was required to trigger a mandatory minimum.").

The jury found that Christopher possessed at least five kilograms of cocaine, so the district court's finding that the PSR was correct in its calculation of a drug quantity significantly more than that[32] is entirely consistent with the jury finding -- and entirely appropriate. See United States v. Ramos-González, 775 F.3d 483, 508-09 (1st Cir. 2015). There was thus no error in the district court's calculation of a Total Offense Level of 43,[33] corresponding to a GSR of life imprisonment.

In addition to challenging the GSR calculation for Count Seven, Christopher also alleges that the district court erroneously ignored the § 3553(a) factors and considered the life sentence to be mandatory. He bases this contention on the district court's statement that it was "imposing the mandatory life sentence." However, immediately following this statement, the district court clarified that the sentence was "[m]andatory in the sense that

---

[32] The PSR concluded that Christopher was responsible for 1,076,248.4 kilograms of marijuana equivalent over the life of the conspiracy. Of that amount, 1,053,580.4 kilograms was attributable to some form of cocaine.

[33] Technically, Christopher was at a Total Offense Level of 48, but because the highest Total Offense Level is 43 the Guidelines call for reducing it to 43.

that's what the guidelines call for." Indeed, the court went on to state that there was "nothing before me that would tell me that I should do anything different by departure or by variance, and I will not." Thus, though the district court did use the term "mandatory," it is clear from its clarification and decision not to impose a variance that this was simply a misstatement, and that the court was well aware that the life sentence was not mandatory.

Moreover, the court's comment that there was "nothing before me that would tell me that I should do anything different" was most likely a reference to, and rejection of, the § 3553(a) sentencing factor arguments contained in Christopher's sentencing memorandum. While we wish this statement was clearer and more explicit, it was sufficient. See United States v. Savoie, 985 F.2d 612, 621 n.11 (1st Cir. 1993) (rejecting defendant's argument that the district court failed to address the § 3553(a) factors given "the pointed comments delivered by the district court at sentencing"); see also United States v. Ocasio-Cancel, 727 F.3d 85, 91 (1st Cir. 2013) ("[A] within-the-range sentence usually demands a less detailed explanation than a variant sentence.").

Finally, Christopher argues that the district court erred in failing to calculate the applicable GSR for Count Nine, instead choosing to "group[]" the two counts together since there was "no point" in calculating the sentence for each count separately. We agree this was error. "[T]he proper procedure" during sentencing

"is to render a separate sentence on each count." Zavala-Martí, 715 F.3d at 51 n.6 (internal quotation marks omitted). This is especially true here where Count Nine did not authorize a life sentence; rather, it carries a twenty-year maximum penalty.[34] See Almonte-Núñez, 771 F.3d at 92 ("[C]ollateral consequences may arise as a result of an above-the-maximum sentence imposed on a particular count. . . . It strikes us as both unwise and unfair to place the risk of such harm on the defendant where, as here, the excessive sentence is easy to correct.").

Accordingly, we vacate Christopher's sentence and remand so that the district court may impose an individual sentence on each of the two counts of conviction.

## V. Conclusion

For the foregoing reasons, we affirm the convictions of all three Defendants. We also affirm Cummings's sentence, but we vacate and remand Christopher's sentence so that the district court can impose an individual sentence on each count.

**AFFIRMED IN PART, VACATED AND REMANDED IN PART.**

---

[34] To the extent the district court was attempting to apply U.S.S.G. § 3D1, which allows different counts to be grouped together for determining the Total Offense Level, that would not justify the imposition of a sentence on Count Nine in excess of the statutory maximum. As we explained in United States v. Almonte-Núñez, "Guideline calculations simply cannot usurp a maximum level of imprisonment established by Congress. Nor does grouping by some mysterious alchemy blend the maximum penalties for each of the grouped counts." 771 F.3d 84, 92 (1st Cir. 2014) (internal citation omitted).