# United States Court of Appeals
## For the First Circuit

Nos. 19-1491, 19-2060

IN RE: JEDRICK BURGOS AMADOR,

Respondent, Appellant,

v.

UNITED STATES OF AMERICA,

Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Francisco A. Besosa, U.S. District Judge]

Before*

Barron, Chief Judge,
Howard, Circuit Judge.

Linda Backiel for appellant.
David C. Bornstein, Assistant United States Attorney, with
whom W. Stephen Muldrow, United States Attorney, and Mariana E.
Bauzà-Almonte, Assistant United States Attorney, were on brief,
for appellee.

April 2, 2024

---

* This opinion is filed by a quorum of the panel pursuant to
28 U.S.C. § 46(d).

**HOWARD, Circuit Judge**. Attorney Jedrick Burgos-Amador ("Burgos") appeals from an order disqualifying him from representing José Mulero Vargas ("Mulero"), a defendant in a criminal proceeding. The order was based on a finding of a potential conflict of interest and required Burgos to disgorge his legal fees.[1] For the reasons discussed below, we conclude that the district court exceeded its discretion when a magistrate judge subjected Burgos to examination under oath by prosecution counsel in an inquiry about who paid his legal fees in his representation of Mulero. Accordingly, we reverse the district court's order of disgorgement.

## I. BACKGROUND

In May 2017, officers from the Puerto Rico Police Department executed a search warrant at Mulero's apartment and seized seven firearms, over 1000 rounds of ammunition, 266 baggies of cocaine, six digital scales, and a drug ledger. Mulero was subsequently arrested and indicted for possession with intent to distribute a detectable amount of cocaine, in violation of 21 U.S.C. § 841(a)(1); possession of a machinegun in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(B)(ii); and possession of a firearm in furtherance of

---

[1] Mulero eventually entered a guilty plea in the underlying criminal prosecution. On appeal, Burgos challenges the rationale for the disqualification, but he seeks reversal only of "the order of disgorgement as the result of conflicted representation."

- 2 -

a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

In response to a financial affidavit submitted by Mulero,[2] the district court determined that Mulero was indigent and appointed counsel for his defense. The following day, however, privately retained attorney Mariela Maestre-Cordero ("Maestre") filed a notice of appearance on Muerlo's behalf. Maestre served as Mulero's counsel for almost two months, appearing on his behalf at the initial detention and bail hearings, before attorney Javier Cuyar-Olivo ("Cuyar") filed a notice of appearance and Maestre subsequently withdrew.

In July 2017, Mulero filed a joint motion to suppress with his codefendant, and three private attorneys including Cuyar, Burgos, and Ricardo Lozada-Franco ("Lozada") attended the suppression hearing. Roughly a year later, in July 2018, attorneys Burgos and Lozada filed notices of appearance on Mulero's behalf, and Cuyar (who had accepted a position at the office of the Federal Public Defender for the District of Puerto Rico) withdrew.

Subsequent to Mulero's claim of indigency at the time of the arrest, the United States moved the district court to inquire into "[t]he source of the attorney fees which have caused attorneys

---

[2] Mulero's financial affidavit was submitted pursuant to 18 U.S.C. § 3006A(b), which provides that "counsel will be appointed to represent [a defendant] if he is financially unable to obtain counsel."

Jedrick Burgos Amador and Ricardo Lozada Franco to appear on behalf of [Mulero]" and "[w]hether defense counsel have been retained or paid by someone other than the defendant . . . [i]f so, whether defense counsel have a potential conflict of interest . . . [w]hether defendant waives any such conflict of interest; and . . . [w]hether the Court should accept the waiver." [Dkt. 142 at 1]

Mulero moved to strike the government's request as an unsubstantiated "fishing expedition" and argued that the court could convene a hearing on the source of the funds paying for Mulero's attorneys only if the government could show an "actual conflict or a serious potential for conflict." The district court denied Mulero's motion to strike and scheduled an evidentiary hearing on the source of the funds before a magistrate judge, ordering that attorneys Burgos, Lozada, Maestre and Cuyar all attend the hearing.

At the outset of the hearing before the a magistrate judge, the court spoke at length to lay a "foundation" for the proceedings, announcing that, "taking into consideration" Mulero's stated indigency, the fact that multiple private attorneys had appeared on his behalf, and the nature of the charges against him, "it [was] reasonable to grant the present hearing to determine if a third party is paying the fees of [Mulero's] retained counsel and whether a conflict of interest exists in such third party fee arrangement." Burgos voiced his objections to the premise of the

hearing, arguing that the government's position that a potential conflict existed was overly speculative, that the government's purported motive in legitimately ensuring that no conflict existed was belied by the timing of its motion (which was filed well over a year after Mulero had initially retained private counsel), and that the government sought to use the hearing as a means to investigate the government's "belie[f] that the person paying [the attorneys' fees] perhaps . . . is a person upper in the ladder." He also argued that live testimony was unnecessary because he could provide via proffer the identity of the third party who was paying the fees, and he assured the court that there was no conflict. Notwithstanding these objections and proffer, the court allowed the hearing to proceed, finding that, although "there is no per se prohibition of a criminal defendant to have his fees paid by a third party," the government had made "sort of a prima facie showing based on the record, that . . . there is the possibility of a conflict of interest," that it was unpersuaded of any nefarious intent on the part of the government, and that it did not need to accept Burgos's good faith representation.

The court then asked the government to call its first witness, and the government called Burgos. Burgos responded that "[t]hat's not going to happen, Your Honor, I'm sorry," and, when further pressed to take the witness stand, asserted his Fifth Amendment right not to testify, explaining that "this puts [him]

in a very uncomfortable position. . . . [and] makes [him a] witness in this case where [he is] the defendant's attorney[]," which he believed to be "unethical." Notwithstanding this objection, Burgos proffered that Cuyar was the person who paid his fees. After explaining to Burgos that the relevant ethics rules precluding attorney testimony did not apply under these circumstances, see Model Rules of Pro. Conduct r. 3.7(a)(2) (Am. Bar Ass'n 2020), the court confirmed Burgos's intention to assert the Fifth Amendment privilege and took the matter under advisement.

The court then heard testimony from Cuyar and Maestre. Cuyar testified that he had been retained by Mulero's mother for $15,000 cash; that she told him, at the time, that she obtained most of the funds by liquidating a pension trust that she had as a Home Depot employee; and that a portion of the fees were obtained from an aunt. Cuyar further explained that he had asked Mulero's mother for evidence documenting the withdrawal from the Home Depot pension trust. Mulero's mother provided Cuyar with a one-page document showing a withdrawal from a Home Depot trust account, made approximately three weeks before his retention, in the amount of $17,500. The document, which was admitted into evidence, bore an account number but did not reflect an individual holder's name. Cuyar testified that, when he arranged for Burgos to replace him as lead counsel, they negotiated a $5,000 payment from Cuyar to Burgos, and that Cuyar made that payment from a personal account

because the money he received from Mulero's mother had already been spent by that time. Cuyar testified that he had no knowledge as to whether Burgos had received additional funds from anyone else in connection with the representation of Mulero.

Maestre testified that she was also hired by Mulero's mother, and that she received an initial cash retainer of $10,000 that Mulero's mother told her had been gathered from various family members. Due to Mulero's termination of Maestre's representation, and the fact that her representation was short-lived, Maestre asked Mulero what a reasonable refund of the retainer would be, but Mulero informed Maestre that he did not want a refund, and none of Mulero's family members ever asked Maestre for a refund.

Before the hearing's conclusion, the court reiterated Burgos's invocation of the Fifth Amendment as to the "source of the fees," which Burgos then confirmed he was doing "[o]ut of an abundance of caution." The court stated that it had heard "nothing that would even give . . . an incidental clue as to why [Burgos] fe[lt]" it necessary to do so. Nevertheless, the court explained that, by invoking the Fifth Amendment, Burgos and Lozada "indicated to this Court . . . that to answer the questions, you would be implicating yourselves in criminal activity. That is the understanding of the Court and that is what the record will so reflect."

- 7 -

In its report and recommendation following the hearing, the magistrate judge recommended that Burgos and Lozada be disqualified from Mulero's case and ordered to return the fees that they were paid for their representation of Mulero. The district court adopted the magistrate judge's report and recommendation in a written opinion and ordered the disqualification and disgorgement.

After denying Burgos's motion for reconsideration, at Burgos's request the district court stayed the fee disgorgement order "until the latest of the date to file an appeal or until any appeal is resolved." Mulero pled guilty in May 2019, and the judgment against him was entered on September 4, 2019. On May 1, 2019, Burgos filed a notice of appeal "from the interlocutory order imposing sanctions and fee disgorgement" entered by the district court. On October 2, 2019, Burgos filed a second notice of appeal, although he maintained that his May 1, 2019 notice of appeal had ripened upon entry of final judgment in September 2019.

## II. TIMELINESS

We begin by addressing whether we may entertain either of Burgos's appeals. The government contends that both of Burgos's notices of appeal are untimely and therefore that this court must dismiss his appeal. See Amadi v. Dep't of Child. & Fams., No. 19-1029, 2019 WL 3035571, at *1 (1st Cir. Apr. 29, 2019) (dismissing an appeal where the appellant failed to file a timely notice of

- 8 -

appeal); see also Local Rule 27.0(c) (stating that this court may dismiss appeal at any time for lack of jurisdiction).

The parties focused their original briefing on whether the two notices of appeal were timely under Fed. R. App. P. 4(b)(2), which governs notices of appeals in criminal cases. However, on August 11, 2022, we subsequently asked the parties to brief additionally whether Burgos's "appeal challenge[s] an 'ancillary order[] in a criminal case' that is 'civil in substance,' see United States v. Segal, 938 F.3d 898, 902-03 & n.1 (7th Cir. 2019), such that it is governed by Federal Rule of Appellate Procedure 4(a) rather than Rule 4(b)," and, if so, whether Burgos's second notice of appeal was timely filed under Rule 4(a).[3] Having considered the supplemental briefs, we conclude that Rule 4(a) governs the time limit applicable to Burgos's appeal and that Burgos's second notice of appeal was therefore timely filed.[4]

---

[3] This request was made to the parties pursuant to our obligation to "mount an independent inquiry into the existence vel non of appellate jurisdiction." Calvary Chapel of Bangor v. Mills, 984 F.3d 21, 26 (1st Cir. 2020).

[4] Because we conclude that Rule 4(a) applies and therefore Burgos's second notice of appeal is appropriately before us, we do not consider the various arguments made by the parties concerning the timeliness of Burgos's first notice of appeal or the timeliness of either notice under Rule 4(b).

**A.**

The Federal Rules of Appellate Procedure specify that different time limits apply to the filing of a notice of appeal depending on whether the appeal is filed in a civil or a criminal case. Compare Fed. R. App. P. 4(b)(1)(A) ("In a criminal case, a defendant's notice of appeal must be filed in the district court within 14 days after the later of: (i) the entry of either the judgment or the order being appealed . . . ."), with Fed. R. App. P. 4(a)(1)(B) ("The notice of appeal [in a civil case] may be filed by any party within 60 days after the entry of the judgment or the order appealed from if one of the parties is: (i) the United States . . . .").[5]

However, whether the underlying case from which an appeal is taken - criminal or civil - is not wholly determinative

---

[5] There is also an important doctrinal difference between these time limits. Strictly speaking, the criminal appeal filing deadline is not jurisdictional, because it is imposed only by a Federal Rule and not a statute. See United States v. Carpenter, 941 F.3d 1, 5 (1st Cir. 2019) ("[O]nly Congress may determine a lower federal court's subject-matter jurisdiction." (quoting Hamer v. Neighborhood Hous. Servs. of Chi., 538 U.S. 17, 19 (2017))). Instead, the deadline is a "mandatory claim-processing rule" which can be waived or forfeited by the government. Hamer, 538 U.S. at 20. The civil filing deadline, by contrast, is jurisdictional because it is codified in 28 U.S.C. § 2107(b). See Segal, 938 F.3d at 902 ("The 60-day civil deadline where the United States is a party is statutory, however, established by 28 U.S.C. § 2107(b), so it is jurisdictional."). That deadline, then, "is not subject to waiver or forfeiture and may be raised at any time in the court of first instance and on direct appeal." Hamer, 583 U.S. at 20. Nevertheless, the government properly raised the timeliness issue here, so the difference is immaterial.

of which time limit should apply.  Instead, courts may "appl[y] a pragmatic approach that looks to the 'substance and context, and not the label, of the proceeding appealed from to determine its civil or criminal character.'" Segal, 938 F.3d at 902 (internal alterations omitted) (quoting Betts v. United States, 10 F.3d 1278, 1283 (7th Cir. 1993)).  This is "because 'many appealable orders technically "in" criminal cases look more civil than criminal,' especially when they pertain to 'postjudgment remedies . . . collateral to criminal punishment.'" Id. at 902-03 (alterations in original) (quoting United States v. Taylor, 975 F.2d 402, 403 (7th Cir. 1992)).  Accordingly, although the underlying case from which Burgos appeals is a criminal prosecution, we look "pragmatic[ally]" at the "substance and context" of the specific proceedings from which Burgos appeals in order to determine whether Rule 4(a)'s or Rule 4(b)'s time limit should apply.  Id. at 902.

In doing so, we are guided by the distinction drawn by other circuits between the criminal sentence -- "[t]he core of a criminal case to which Rule 4(b) applies," id. (second alteration in original) (quoting United States v. Apampa, 179 F.3d 555, 556-67 (7th Cir. 1999)) -- and orders "collateral to criminal punishment" which are "especially" likely to "look more civil than criminal," id. at 902-03 (quoting Taylor, 975 F.2d at 403).  Indeed, "[t]he term 'criminal case' in Rule 4(b) generally is construed narrowly to encompass only 'a prosecution brought by the government to

secure a sentence of conviction for criminal conduct.'" United States v. Lavin, 942 F.2d 177, 181 (3rd Cir. 1991) (quoting 9 J. Moore, B. Ward, & J. Lucas, Moore's Federal Practice ¶ 204.15, at 4-132 (2d ed. 1991)). "Conversely, the term 'civil case' in Rule 4(a)(1) generally is construed broadly to include 'any action that is not a criminal prosecution.' As a result, proceedings that essentially are civil in nature are deemed to be 'civil cases,' even though they derive from a prior criminal prosecution." Id. at 181-82 (alteration in original) (internal citation omitted) (quoting Moore et al., supra, at 4-29).

Applying these standards, courts have uniformly treated appeals from orders in criminal cases that are collateral to criminal punishment as civil matters for purposes of Rule 4. For example, courts have applied Rule 4(a) to appeals from the denial of the return of property under Fed. R. Crim. P. 41(e), see Taylor, 975 F.2d at 403; sureties' appeals of bail-bond forfeiture orders, see C.A. Wright & A.R. Miller, Federal Practice and Procedure § 3950.8 n.83 (5th ed., Apr. 2021 update) (collecting cases from the Third, Fifth, Seventh, Eighth, Ninth, Tenth and Eleventh Circuits); appeals from proceedings under 21 U.S.C. § 853(n) in which third parties claim an interest in criminally forfeited property, see United States v. Bradley, 882 F.3d 390, 392-93 (2d Cir. 2018); appeals from the enforcement of restitution orders, see United States v. Phu Tan Luong, 291 F. App'x 73, 74-75 (9th

- 12 -

Cir. 2008) (unpublished) (concluding that "motions relating to a [movant's] financial interests do not implicate analogous liberty interests" to those at stake in a criminal prosecution); and appeals from orders denying a criminal defendant the right to obtain attorney's fees under the Hyde Amendment (18 U.S.C. § 3006A), see United States v. Braunstein, 281 F.3d 982, 992-93 (9th Cir. 2002) (collecting cases from the Fourth, Fifth, and D.C. circuits).

By contrast, courts have found that Rule 4(b) governs appeals from the denial of a motion for the correction or reduction of sentence; from the denial of a motion to modify a term of imprisonment; from the denial of a motion for a new trial; and from a forfeiture imposed as a part of a criminal defendant's punishment. See 20 James Wm. Moore, et al., Moore's Federal Practice - Civil § 304.20 (3d ed. 2021) (collecting cases); see also C.A. Wright & A.R. Miller, supra, at § 3950.8 nn.88-113 (explaining the same and providing additional examples of appeals that have been deemed criminal). Notably, each of these examples involved appeals from orders that directly pertained to criminal punishment -- "the core of a 'criminal case.'" Segal, 938 F.3d at 902.

Here, Burgos's appeal does not challenge the prosecution of or sentence imposed on Mulero, nor is it brought by, or on behalf of, him. Instead, this appeal is brought by Burgos, a

third-party in the underlying criminal case, and it challenges proceedings and a ruling below that were entirely separate from the ultimate imposition of the criminal sentence. This appeal is thus decidedly not from, but instead collateral to, the government's criminal prosecution of Mulero.

Nevertheless, the government contends that "the disqualification order here cannot be viewed as civil in nature" because the "'purpose' of both the order and the conflict-of-interest inquiry it arose from was 'to ensure preservation of the defendant's Sixth Amendment right to counsel.'" Although the government is correct that this inquiry was conducted in order to ensure that there was no violation of Mulero's Sixth Amendment right to counsel -- a right guaranteed to criminal defendants -- this does not mean that the disqualification order or the proceeding that it resulted from were themselves criminal in nature.

The proceeding was explicitly aimed at determining whether a conflict of interest existed vis-a-vis Burgos's representation of Mulero. The relevant conflict rules underlying this inquiry, the Model Rules of Professional Conduct, are civil rules that are generally applicable to all attorney-client relationships, regardless of whether the representation is in a civil or criminal matter. See D.P.R. Local Civ. R. 83E(a) ("[E]ach attorney admitted or permitted to practice before this court shall

- 14 -

comply with the standards of professional conduct required by the Model Rules of Professional Conduct . . . adopted by the American Bar Association. . . ."). Further, there is no provision imposing criminal penalties against a conflicted counsel, and the disqualification and disgorgement that Burgos appeals cannot be fairly characterized as a criminal punishment as to either him or Mulero. Cf. Bradley, 882 F.3d at 393 (holding that proceedings considering third-interest in criminal forfeiture assets, under 21 U.S.C. § 853(n), are civil in nature because, inter alia, such "proceeding[s] [have] no punitive aim," but rather "merely seek[] to settle legal interests in property," and the "underlying legal issue (the allocation of property interests) are civil in nature"). Indeed, both disqualification and disgorgement are remedies which are commonly imposed in civil cases. See, e.g., Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 552 F.3d 47, 67 (1st Cir. 2009) (noting that courts have permitted disgorgement of malefactors' profits as remedy for unjust enrichment in civil suits, such as patent suits and suits for breaches of fiduciary duty).

Accordingly, we find that the proceedings and order from which Burgos appeals are properly considered civil, not criminal, in nature such that it is appropriate to apply Rule 4(a)'s 60-day time limit to his appeal.

**B.**

Having determined that the time limit under Rule 4(a) applies, we conclude that Burgos's second notice of appeal was timely. That notice was filed on October 2, 2019, 28 days after the operative district court order was entered on September 4, 2019, and thus well within the 60-day time limit applicable here under Fed. R. App. P. 4(a).

In fact, the government does not dispute that "Burgos's second notice of appeal would be timely if Rule 4(a) applied." However, the government contends that Burgos has "deliberately waived his ability to rely on [the second notice of appeal]" and thus that we may only look to Burgos's first notice of appeal when determining timeliness under Rule 4(a). We are not persuaded that such waiver has occurred here.

Waiver may occur where a party "strategically [withholds] or [chooses] to relinquish" an argument. Wood v. Milyard, 566 U.S. 463, 472 (2012) (quoting Day v. McDonough, 547 U.S. 198, 210-11 (2006)). The government asserts that, although Burgos filed a second notice of appeal, his characterization of that second notice as "superfluous" and "redundant" constituted a waiver of that appeal and any possible reliance on it. In support, the government analogizes the situation here to Wood v. Milyard, which held that a party had waived a statute-of-limitations defense where the party repeatedly "express[ed] its clear and accurate

- 16 -

understanding of the timeliness issue" but nonetheless chose to neither challenge nor concede the issue, opting instead to "deliberately steer[] the District Court away from the question and towards the merits" of its petition. 566 U.S. at 474. However, Wood dealt with a situation in which a party acknowledged an issue but nonetheless declined to take any action in response. Wood is thus a far cry from the situation here, in which Burgos acknowledged the timeliness issue and took affirmative action in response to that issue by filing the second notice of appeal.

Furthermore, we do not read Burgos's references to that appeal as "superfluous" and "redundant" as disclaiming any reliance on the appeal or as sufficiently "steering" this court away from that notice to constitute "relinquish[ment]," bringing it within the ambit of the situation at issue in Wood. Instead, read in context, that language appears to merely indicate Burgos's position that the second notice of appeal raises the same issues and arguments as, and is thus substantively identical to, the first notice of appeal and does not introduce anything new to the court.

Because Burgos's second notice of appeal was timely, we turn to the merits of his appeal.

### III. MERITS

Burgos asserts that the district court erred in three distinct ways with respect to the proceedings and order at issue, and that any one of those alleged errors provides sufficient

- 17 -

grounds for reversing the disgorgement order.  First, Burgos asserts that the district court lacked a sufficient basis on which to hold a hearing regarding the source of the attorneys' fees. Next, Burgos contends that the district court erred when it required Burgos to testify at the hearing subject to examination under oath by the government's counsel.  Finally, Burgos argues that the district court erred when it issued the disqualification and disgorgement order based on Burgos's invocation of his Fifth Amendment right at the hearing.

Our abuse-of-discretion standard governs decisions "on whether or not to convene an evidentiary hearing," see In re Grand Jury Subpoena, 274 F.3d 563, 576 (1st Cir. 2001), issues of "courtroom management," see Elgabri v. Lekas, 964 F.2d 1255, 1260 (1st Cir. 1992), and orders "disqualify[ing] an attorney for conflict of interest," see United States v. Laureano-Pérez, 797 F.3d 45, 52 (1st Cir. 2015).  Within this multi-faceted standard, "abstract questions of law are reviewed de novo, findings of raw fact are reviewed for clear error, and judgment calls receive a classically deferential reception."  Riva v. Ficco, 615 F.3d 35, 40 (1st Cir. 2010).

After careful review, we conclude that the district court exceeded its discretion in subjecting Burgos to sworn direct examination by prosecution counsel when the district court did not know, and lacked reason to know, that there was a particular

- 18 -

conflict of interest arising out of a third-party payment. Accordingly, we reverse the district court's disgorgement order.

## A.

Trial courts are under a duty to inquire when confronted with a potential conflict of interest that could impact a defendant's Sixth Amendment right to representation free from conflict. The Sixth Amendment, which guarantees the right of an individual accused in a criminal prosecution to "have the Assistance of Counsel for his defen[s]e," U.S. Const. amend. VI, has been construed to confer "the right to have an attorney of one's own choosing," see Laureano-Pérez, 797 F.3d at 55-56 (internal citations omitted), as well as a "correlative right to representation that is free from conflicts of interest." Mountjoy v. Warden, 245 F.3d 31, 36 (1st Cir. 2001) (quoting Wood v. Georgia, 450 U.S. 261, 271 (1981)). Thus, although the district court "must recognize a presumption in favor of [a defendant's] counsel of choice," see Wheat v. United States, 486 U.S. 153, 164 (1988), this right "is not absolute," Laureano-Pérez, 797 F.3d at 55-56. See also United States v. Lanoue, 137 F.3d 656, 663 (1st Cir. 1998); Maynard v. Meachum, 545 F.2d 273, 278 (1st Cir. 1976).

Given that the "essential aim" of the Sixth Amendment "is to guarantee an effective advocate for each criminal defendant," Wheat, 486 U.S. at 159, this right to counsel of choice is necessarily limited by the "trial court's interest in ensuring

- 19 -

that criminal trials are conducted within ethical and professional standards." Laureano-Pérez, 797 F.3d at 55-56 (quoting In re Grand Jury Proceedings, 859 F.2d 1021, 1023 (1st Cir. 1988)). Accordingly, where a trial court is, or reasonably should be, aware of a possible conflict of interest, there is a duty for the court to investigate that possibility. See Mountjoy, 245 F.3d at 38 ("[T]rial judges have a duty to inquire [into a potential conflict of interest] not only when defendants object to a possible conflict, but also when trial judges are or should be independently aware of a possible conflict."); Wood, 450 U.S. at 272 (finding that the "possibility of a conflict of interest was sufficiently apparent at the time of the revocation hearing to impose upon the court a duty to inquire further" (emphasis in original)); cf. Cuyler v. Sullivan, 446 U.S. 335, 347 (1980) ("Unless the trial court knows or reasonably should know that a particular conflict exists, the court need not initiate an inquiry.").

One such scenario in which courts have found the possibility of a conflict of interest sufficient to warrant further investigation is where an attorney's fees are known to have been paid by a third party. In Wood, the Supreme Court noted that there are "inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the operator of the [defendant's] alleged criminal enterprise." 450 U.S. at 268-69.

Thus, where facts give rise to the possibility of a conflict due to such a third-party payer situation, a "duty to inquire further" is "impose[d] upon the court." Id. at 272; see also Quintero v. United States, 33 F.3d 1133, 1134 (9th Cir. 1994) (directing "trial judges, particularly in drug cases, to determine whether or not third parties are paying the fees of retained counsel when the defendant is indigent and, if so, whether the defendant understands the potential conflict of interest that may exist in such an arrangement and voluntarily waives that conflict").

Informed by Wood, district courts within this circuit have conducted inquiries into the source of a defendant's attorney's fees where the concern of a possible conflict due to third-party payment is raised, and we have affirmed the subsequent disqualification of the attorney where a hearing revealed facts indicating the presence of such a conflict. See Laureano-Pérez, 797 F.3d at 53, 56-57. Burgos nonetheless contends that the court abused its discretion by "authorizing [the] interrogation of defense counsel by the prosecution."[6] He asserts that there was

_____

[6] The government contends that Burgos "forfeited this argument below" by "not object[ing] at the evidentiary hearing that the court wanted the prosecutor to question him" and that, because he does not now assert that this argument should be reviewed for plain error, has "waiv[ed] review of this argument." We agree with Burgos, however, that his efforts to avoid testifying under oath and his insistence that doing so would be improper made it "abundantly clear" that he objected to testifying under oath as a witness for the prosecution. Although, as he acknowledges, Burgos did not explicitly state "I object" when called to testify, his

an "absence of any specific facts pointing to the need to resort to this method" and that the district court "gave no weight to the impact of such a procedure on the role of defense counsel in an adversary system of justice and his duties to his client." Burgos further contends that "the duty imposed on the court is not to carry out or preside over an investigation, but to hold a colloquy." For the reasons we will next explain, we agree with this aspect of Burgos's challenge.

**B.**

Even though Burgos received permission from his client to disclose the name of the third-party payer, thereby waiving any potential attorney-client privilege that may bar such disclosure, there were other aspects of the attorney-client relationship that were put at risk of being undermined when the district court allowed the prosecution to examine him under oath. As one district court in our circuit has recognized, "in a hearing regarding the source of attorney fees, counsel would be forced to testify against defendant -- and this remains so whether counsel responds to the

_____

refusal to take the stand and his pronouncements that "[t]hat's not going to happen" and that "the rule of ethics bar[red]" him from doing so were sufficient to clearly indicate his objection to the process and the grounds for that objection. Cf. United States v. Pereira, 848 F.3d 17, 26-27 (1st Cir. 2017) (finding an objection "suffic[ient]" where the party demonstrated "that the ground for the objection was obvious from the context in which it was made" (quoting United States v. Boyd, 54 F.3d 868, 872 (D.C. Cir. 1995)).

- 22 -

underlying questions with 'yes,' 'no,' 'I don't know' or 'I plead the Fifth.'" United States v. Gonzalez-Mendez, 352 F. Supp. 2d 173, 175 n.1 (D.P.R. 2005). Indeed, "[c]ounsel would be forced to step outside his role as counsel for defendant in order to testify about or even against defendant, thereby creating a conflict of interest, irreparably damaging the relationship." Id. at 176.

At Burgos's hearing, the government attempted to distinguish the hearing from the one in Gonzalez-Mendez, arguing that the latter involved "trying to trace the source of fees" and "delving into much more than simply who was paying the fees" while the government here was merely seeking the "identity of the person paying the fees." But the record shows that, at the hearing itself, even though Burgos told the court that his client had "no objection" against Burgos revealing the name of the third-party payer, the court immediately afterward stated, "just identifying the name alone isn't necessarily what is going to . . . put the Court in a position to determine when there's conflict and who is this individual. What's the relationship to this defendant?" Burgos then replied, "But that's easy, Your Honor," at which point the court insisted on placing Burgos under oath and asked prosecution counsel to call the first witness.

The government does argue on appeal that, on May 5, 2017, Mulero initially filed a financial affidavit to request a public defender for himself based on his indigency, and that same day a

public defender was appointed to represent him.[7]  It then points out that just days later, Mulero retained a private attorney who appeared on his behalf.  But while we do not disagree that this reversal in such a short amount of time provides a basis for inquiring into whether someone other than Mulero himself had paid for that private attorney as well as for the subsequent private attorneys that Mulero retained, these aspects of the record did not themselves give the district court reason to believe that there was a particular conflict that could support its choice to subject Burgos to examination under oath by the prosecution.  As the Second Circuit has explained in the context of identifying limitations on testimony, the district court's "'discretion to place reasonable limits on the presentation of evidence.' . . . must remain tethered in some way to the facts and circumstances of the case presented." United States v. Quattrone, 441 F.3d 153, 183 (2d Cir. 2006) (quoting United States v. Ford, 88 F.3d 1350, 1362 (4th Cir. 1996)).  Nor does the fact that Burgos eventually speculated at the hearing that the government might "believe that the person paying . . . is a person upper in the ladder" negate the fact that the district court had no reason to believe that there was a

---

[7] In that affidavit, Mulero claimed that he earned only $150 dollars each month, that his monthly expenses for his rent and phone far exceeded that income, that he had no other source of income, and that he did not own property or have cash.

- 24 -

particular conflict when it first decided to allow the prosecution to examine Burgos under oath.

Of course, there may be circumstances in which requiring an attorney to answer questions from the court under oath may be warranted. But, given the circumstances of this case, we see no basis for the court to have permitted examination by prosecution counsel. After all, the government's sparse motion for the inquiry did not even contain any speculation about what the potential conflict could have been.

In contending otherwise, the government points in part to our decision in Laureano-Pérez, one of the leading cases in our circuit on this type of inquiry. But there we held merely that it was not an abuse of discretion for a district court to disqualify an attorney after an evidentiary hearing that was conducted to determine the source of the attorney's payments conclusively revealed the existence of third-party payments, the name of the payer, and the payer's "control over a bunch of things that pertain to the defense." Laureano-Pérez, 797 F.3d at 55. Notably, in Laureano-Pérez, the district court did not subject the defense counsel to interrogation by the prosecution counsel nor did the district court require the defense counsel to answer questions under oath.

Neither does the Supreme Court's decision in Wood, on which the government also relies, support the district court's

decision here.  In that case, it was known that the third-party payer was an employer of the client, and that fact plus the fact that the employer had "declined to provide money to pay the fines in the cases presently under review" supported the inference of there being a particular conflict: that the employer was seeking to create a test case.  450 U.S. at 266-67.  Moreover, even still, Wood was silent on whether a court must -- or even may -- conduct its conflict-of-interest inquiry by subjecting an attorney to examination under oath by prosecution counsel.  Indeed, we are aware of no precedent from any court permitting a court to subject an attorney to examination under oath by the prosecution when the predicate for believing there to be a particular conflict arising from a third-party payment was as limited as was present here.

Accordingly, the record insufficiently supports the district court's exercise of discretion in requiring Burgos to submit to examination under oath by prosecution counsel when the court had so little basis to believe that a particular conflict would have arisen from a third-party payment.  And we agree with Burgos that the conduct for which he was sanctioned by the court was the direct consequence of that court's decision to require him to submit to that examination.  See Elgabri, 964 F.2d at 1260 ("We do not disturb decisions regarding courtroom management unless these decision amount to an abuse of discretion that prejudices appellant's case.").  Moreover, while the government is right that

Burgos later stated in an affidavit that his invocation of the Fifth Amendment was unnecessary because he "could have answered the questions posed by counsel for the government," he made this acknowledgement merely to concede that he would not have been "automatically disqualified" for being "seated as a witness." We thus do not understand that statement by Burgos to be a concession that there was no reason for him to object to being required to submit to examination by the prosecution, such that the statement amounts to a concession that precludes him from showing prejudice.

## IV. CONCLUSION

Because the disqualification was insufficiently supported, the disgorgement order is **reversed**.